**James E. WILLIAMS, Plaintiff,**

**v.**

**The ATCHISON, TOPEKA AND SANTA FE RAILWAY, Defendant.**

No. 83–0828–CV–W–6.

United States District Court,
W.D. Missouri, W.D.

Feb. 7, 1986.

Charles S. Scott, Jr., Kansas City, Mo., for plaintiff.

Jack W.R. Headley, Jack D. Rowe, Lathrop, Koontz, Righter, Clagett & Norquist, Kansas City, Mo., for defendant.

### MEMORANDUM AND ORDER REGARDING TITLE VII LIABILITY

SACHS, District Judge.

Plaintiff Williams, a black former employee of defendant railroad company (San-ta Fe) has filed a multiple-count complaint alleging negligent injury, employment discrimination because of his race and violation of the Missouri Service Letter Statute. The Second Amended Complaint (Document # 38) is in eight counts. By reason of judicial rulings and a jury's verdict defendant has prevailed on a claim for discriminatory discharge (42 U.S.C. § 1981) and for negligent injury, 45 U.S.C. §§ 51–60. Nominal damages in plaintiff's favor are being awarded for a technical violation of the Service Letter Statute, § 290.140, RSMo. Remaining to be ruled is the Title VII discrimination claim (42 U.S.C. § 2000e et seq.) relating to conditions of employment. As developed by the evidence, plaintiff's remaining claim is that defendant tolerated racist remarks, slurs and jokes by his fellow employees on its line between Fort Madison, Iowa, and Marceline, Missouri, so that plaintiff was deprived of normal working conditions during his employment and has refrained from seeking reinstatement to the job that he lost in May 1983.

The conditions-of-employment claim has the least potential, in monetary terms, of the various claims asserted. According to undisputed testimony, plaintiff had also suffered an assault (presumably racist in nature and presumably from a railroad employee) in the Marceline depot in 1979; he also complained of racial harassment and hazing (being dumped from a bench in the park in Marceline) in 1980. More likely than not, at least one railroad employee was involved in that incident. Railroad officials thereafter gave plaintiff maximum demerits on two occasions in 1983 (for taking no action to slow a speeding train on which he was riding and for leaving his job in the Fort Madison yard without waiting to determine if overtime work was required). Having obtained 60 demerits in a short period, he was then terminated.

The demerit issues were submitted to a jury on the question of racial discrimination. The jury rejected the claim. The assault and hazing incidents were withdrawn from the jury because I concluded the railroad was not shown to have been on

notice of violent propensities of the two employee suspects[1] or of any other employees serving in the Marceline area.

The conditions-of-employment claim is challenged by two legal defenses: (1) such a claim cannot be considered because it was not contained in the discrimination charge presented to the EEOC, and (2) all plaintiff's evidence of racist remarks by fellow employees is outside the 180 day period covered by Title VII.

## I.

■ The precise issue presented as to the scope of the charge seems not to have been ruled in this Circuit, and is of some substance. Essentially, the full page of specification in the charge is directed primarily at two incidents in which plaintiff received demerits, resulting in an accumulation which caused his termination in May 1983. The second incident is one in which plaintiff claims direct managerial bias, in that a white employee's departures from work prior to the completion of his shift were overlooked until reported by plaintiff, whereas he was given the maximum number of demerits (30) for one instance in which he left work at the completion of his shift but before notification that overtime work would not be needed. This contention of mistreatment (which the jury rejected as a racially motivated incident) seems quite independent of the conditions-of-employment complaint.

The earlier incident, however, is a bizarre contention that the white members of a train crew were so biased against plaintiff that they sent him to sit in the caboose with a fellow black employee and then speeded the train for a prolonged period so that he would be expected to receive demerits (while they could expect to be and were discharged). This contention was also rejected by the jury, and I find the racially-motivated speeding theory inherently incredible. The claim does, however, fairly trigger inquiry into the relationship between plaintiff and his co-workers. The slightest inquiry into that portion of the charge would surely bring forth the story, heard at trial and within the scope of the Second Amended Complaint, that plaintiff was subjected to harassment by co-workers from the early days of his employment, in 1976, that racial hostility was rampant among the Santa Fe employees and was not dealt with by the employer, and that plaintiff suffered a physical attack and physical hazing in 1979 and 1980, most likely from one or more railroad employees and most likely racially motivated.

The leading case in the Eighth Circuit assessing the scope of the charge as a condition precedent for a judicial proceeding is *Pickney v. American District Telegraph Co. of Arkansas*, 568 F.Supp. 687 (E.D.Ark.1983). In that case, on which defendant relies, Chief Judge Eisele reviewed appellate decisions in this Circuit and elsewhere and held that a charge of sex discrimination in a termination was narrowly focused and did not authorize a subsequent complaint that plaintiff had suffered sex discrimination in denial of promotions. Although the recitations in a charge are to be given liberal construction, as in any pro se proceeding, Judge Eisele noted that there must be some linkage between the charge and a subsequent complaint, and that the latter must be "reasonably related" to the former. It is not, however, the wording of the charge that is controlling; the charge simply triggers an investigation. "A court should not ignore matters unearthed during the conduct of the EEOC's investigation so long as they 'can reasonably be expected to grow out of the charge of discrimination.'" 568 F.Supp. at 690, n. 1. The quotation was

---

1. It was my ruling that, even if the restrictive Eighth Circuit decision in *Sheaf v. Minn., St. P.R. Co.*, 162 F.2d 110, 113 (8th Cir.1947), is no longer to be followed, as seems likely (*Lancaster v. Norfolk & West. Ry. Co.*, 773 F.2d 807 (7th Cir.1985)), there was insufficient evidence that defendant had reason to believe the suspect employees, Edgar and Doherty, were prone to violence. *Compare, Hartel v. Long Island R.R. Co.*, 476 F.2d 462 (2nd Cir.), *cert. denied*, 414 U.S. 980, 94 S.Ct. 273, 38 L.Ed.2d 224 (1973) (criminal assaults not foreseeable and proposed corrective action not demonstrably likely to have been effective).

from the leading case of *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 466 (5th Cir.1970). In *Pickney* the plaintiff did not contend that "the EEOC investigation delved into any matters other than the plaintiff's particular termination and, perhaps, the defendant's termination procedures." 568 F.Supp. at 691. Judge Eisele apparently saw nothing in the charge that would likely trigger inquiry into promotions.

*Pickney* is not dispositive of the case at bar. Nor is the other case cited by defendant, *Matthews v. A–1, Inc.*, 748 F.2d 975 (5th Cir.1984). In that case the district judge considered evidence of sexual harassment "only as relevant background evidence" on a termination charge, and ruled that "no recovery could be based on this factor because it was not included in the E.E.O.C. charge." *Id.* at 976. The plaintiff, who won her case, did not contend an appeal that the district court erred in failing to consider as a separate basis of relief the harassment evidence. While the unreported district court ruling may offer some slight support for the defendant's theory (depending on closer examination of the facts) the appellate commentary has no particular bearing on this case.

The *Sanchez* case, cited in both *Matthews* and *Pickney*, is somewhat supportive of plaintiff's side of the issue. In that case, plaintiff had charged that she had been unpaid for an injury and that she had been struck by a supervisor. This was held to be a sufficient, timely allegation to justify a later developed verbal abuse and harassment claim. Charging one variety of abuse fairly led to inquiry into another.

The present case is somewhat more difficult to call than was *Sanchez*. Neither side presented evidence at trial as to the actual scope of the EEOC investigation. That is not controlling, however, because the essential inquiry is "what EEOC investigation could reasonably be expected to grow" from the original charge. *Babrocky v. Jewel Food Co.*, 773 F.2d 857, 864 n. 2 (7th Cir.1985).

I have no problem accepting the lead of Chief Judge Eisele in his *Pickney* decision, and would give it dispositive effect if the last disciplinary proceeding had been *all* that was within the charge. That disciplinary proceeding seems sufficiently divorced from the issue of rampant racial hostility among co-workers so that it may be deemed insufficiently related to the ultimate complaint that I must deal with. The first claim, however, does rest on a premise of gross racial hostility among the railroad workers and racial harassment in working conditions. Relatedness seems adequate, under *Sanchez*. The complaint flows naturally and almost inevitably from any probing of the speeding charge. That is sufficient to lay the groundwork for my Title VII inquiry.

## II.

The contention that there was no proof of verbal abuse by fellow employees during the final 180 days of plaintiff's employment will be discussed in connection with a review of all the evidence on the subject. To begin at the beginning, it is not in dispute that there were no black employees working out of Fort Madison or Marceline in train service until shortly before plaintiff's employment in 1976. In a spurt of affirmative action, some 15 or 20 black employees were added to the 300 persons in the Third District work force in a short period, abruptly ending in 1977. The black employees were resented by the existing work force, many of whom were related by blood or marriage and all of whom were white. Santa Fe engaged in no educational effort to smooth intergroup relations and seems never to have disciplined or warned or counselled with employees who exhibited racist feelings or made racist remarks. Racial slurs and jokes were and apparently are prevalent, occurring on a "regular" if not "daily" basis, but Santa Fe disclaims any knowledge of the situation, except to acknowledge that railroad workers probably do not talk like white-collar workers.[2]

2. Whatever differences may exist between railroad workers and courthouse workers, it seems

The number of black employees in the District has dwindled to four; Santa Fe's theory as to the cause of this decline in integration is that the black employees probably found lay-overs in Marceline to be "dull."

A white union official and a black former employee who expects reinstatement testified convincingly for plaintiff that racist remarks by employees have been frequent, and that plaintiff was a special target of such remarks because he was rapidly advanced to brakeman and conductor. Plaintiff also testified generally to racist bad-mouthing in Marceline and on the Fort Madison-Marceline line. Such remarks were not frequently made in his presence because he let it be known he resented them and he adopted a practice of separating himself from most of his fellow employees. Plaintiff's self-isolation was largely the result of a perception of racist feelings that was in considerable part true.[3]

Witness Caswell recited a litany of derogatory racial terms regularly heard at the depot in Marceline that "had" to be known by Santa Fe supervisors. A trainmaster is in charge and a special agent (investigator) is in residence. The defendant's reply brief also lists a foreman of road engines. I do not accept a theory that the supervisory employees in a small depot cut off opportunities to be aware of activities in the depot. It is presumably their responsibility to be knowledgeable about employee relations, among other things. Caswell testified to the posting of a "Ku Klux Klan application" on the bulletin board, which he interpreted as more than a sick joke. While there was no testimony as to racist remarks carefully dated to the last six months of plaintiff's service, there was undisputed testimony of a racial incident during that period, in that plaintiff was sent to the caboose to ride with another black employee on the occasion when all were disciplined for "speeding." The conductor in question was terminated for speeding, but shortly reinstated (according to general practice of the railroad). There was no testimony showing that the racial assignment was criticized by management or that the conductor was counselled on racial issues before his reinstatement.

Defendant's evidentiary response to the issue of racial remarks by co-employees was inadequate and unconvincing. The highest supervisor in the District, D.H. Gill, denied awareness of expressions of racist feeling. *See*, however, Plaintiff's Exhibit 14 (Gill memorandum of March 21, 1983, noting racial assignment of plaintiff to caboose). Two of the four black employees testified in effect that they could "take it," and reported no special problem. The fact that some employees were willing or able to tolerate racial remarks does not, of course, relieve the defendant of its obligation to strive for a work environment essentially free of racist remarks and incidents. There was no denial by an official in Marceline (McKennon) that he had declined to inquire of a suspect identified in the "park bench incident" because the racial incident was not on the company premises.[4] Nor was there testimony from the

---

impermissible to exempt them from rules forbidding racial insults. Railroad workers doubtless know how to speak and behave in "mixed company." They must realize that under Title VII railroad workers *are* a "mixed company."

**3.** The jury verdict and my own conclusions are that plaintiff imagines a great deal more racist activity than exists. This is consistent with psychological evidence presented by plaintiff that he has paranoid symptoms, resulting largely from the beating and the incident in the park. Defendant would have me conclude plaintiff is simply lying; I do not find the credibility issues all that simple. Some of the testimony was so bizarre that it apparently is the product of a warped sense of reality. Other portions of the testimony were entirely credible, and plaintiff notably avoided some open-ended invitations to make self-serving statements. My recitations of plaintiff's testimony without comment will be treated as accepted by me as true.

**4.** Assuming arguendo that no discipline would be appropriate for off-premise or after-hours conduct (a subject I need not deal with until considering remedial action), it seems obvious that employee fighting and like conduct would at least require counselling and inquiry. It may be doubted for example that after-hours sexual harassment by supervisors could simply be ignored. Moreover, someone other than McKen-

two other black employees or from all supervisors and special agents at Marceline. While portions of this case were in my judgment overtried by both sides, another hour's testimony on the Title VII issue from another four or five witnesses would not have materially lengthened the trial. It does not take long to make a credible denial, if warranted by the facts.

B.R. Howard, trainmaster at Marceline since 1981, although called as a witness by defendant, did not (according to my notes) testify as to race relations among the employees working out of that depot. The testimony on that subject by plaintiff and his witnesses was neither denied nor identified as "ancient history."

I am left with the distinct belief that Santa Fe thought the racial resentments, and expressions of such resentments, in Marceline and the rest of District Three were "natural" and that it had no responsibility for trying to improve race relations or racial expressions by its employees.

### III.

■■■ On the legal implications of the facts in this case I conclude that plaintiff is not barred by failure to identify particular remarks made during the last 180 days of his employment. The problem was a continuing one, and I do not find that there is convincing evidence that District Three has ever become essentially free of racist expressions.

Nor is the situation de minimis. Slurs were not "isolated" or "casual." If the racial atmosphere in District Three was not really "dismal" (*Taylor v. Jones*, 653 F.2d 1193, 1198–99 (8th Cir.1981)), it was surely very poor. Such conditions violate Title VII "regardless of any other tangible job

detriment to minorities." *Gilbert v. City of Little Rock*, 722 F.2d 1390, 1394 (8th Cir.1983), *cert. denied*, 466 U.S. 972, 104 S.Ct. 2347, 80 L.Ed.2d 820 (1984). While an employer is not held responsible for a sporadic instance of racist (or sexist) talk by a non-supervisory employee, for the same reason that Santa Fe is not liable here for assaults, I am satisfied that exposure to racist talk, known by or knowable by supervisors, was and is a chronic and significant condition of employment in District Three. Although plaintiff was somewhat isolated, largely as a result of the prevailing conditions, and was not personally exposed to frequent, current memorable remarks, he could hardly have been unaware of the situation, and I am satisfied that he found the racist atmosphere oppressive.

Merely because the offensive talk is not so flagrant as to have been reported (and then perhaps investigated) does not free defendant of responsibility. Employee team-work is an obvious job requirement on the railroad. Santa Fe has failed to respond to the needs and legal rights of its racial minority employees.

A Title VII violation has been shown.

### IV.

■■■ On the question of remedies, I agree with defendant that money damages are not recoverable under Title VII for emotional distress, although this deficiency in allowable remedies is to be regretted in a case where at least part of plaintiff's current psychological problems is doubtless attributable to the expressed attitudes of his co-workers. *Muldrew v. Anheuser-Busch*, 728 F.2d 989, 992 (8th Cir.1984).[5]

■■■ Plaintiff contends that damages were allowable for a "constructive dis-

---

non apparently did consider the matter merited investigation, although for some reason an alibi of uncertain reliability (at least as to precise time and date) was accepted, and Doherty, unlike Edgar, was not asked to take a polygraph examination.

5. I believe the working conditions issue is a Title VII issue and not an independent issue under 42 U.S.C. § 1981. *See Minority Police*

*Officers v. City of South Bend*, 617 F.Supp. 1330, 1352 n. 52 (N.D.Ind.1985). It seems to be assumed in some cases, however, that the statutes run parallel, except for the more liberal damage potential of § 1981. *Erebia v. Chrysler Plastic Products Corp.*, 772 F.2d 1250 (6th Cir.1985). But Title VII by its terms is more comprehensive than § 1981, and, except as to damages and time limits, cuts deeper.

charge." It is too late in this litigation to make this contention; moreover it is clear that in early 1983 plaintiff was seeking to keep his job and was also trying to get assignments outside the Fort Madison yard for the higher paying work involved in the run to Marceline. The conditions, while bad, did not cause plaintiff to quit his job.

■ Having found a violation, I am obligated to formulate appropriate equitable relief. Defendant does not contend that the issue has become moot because plaintiff is no longer employed by Santa Fe. Such a condition may change, as there is evidence that terminated persons retain first priority in getting reinstated, and termination does not have the usual significance of that term.

The evidence is mixed as to whether plaintiff desires to be returned to work in District Three. He has failed to seek reinstatement during the almost three years since his termination. It is clear that he no longer wants to work in District Three if faced with the racial conditions previously experienced. Although the attitude of co-workers did not create such resistance in May of 1983, plaintiff's readiness to resume his work has altered during litigation (since the final termination, which he believed, incorrectly, to be discriminatory).

The normal rational response to the situation would be to welcome the comparatively good pay Santa Fe provides if plaintiff can rely on good faith efforts by the railroad to improve intergroup relations and to discipline those who may continue to use racial expressions or engage in other racist acts. Defendant contends the unusual resistance to reinstatement by plaintiff is based on an unwillingness to work (a new characteristic) or a false impression that this litigation may provide him with monetary rewards exceeding those he would enjoy if working for Santa Fe. I do not agree that plaintiff is simply attracted to gold at the end of the rainbow. I do conclude he is influenced by his supposition that Santa Fe is incorrigible and that working conditions will not be improved. In any event, it seems inequitable to penalize plaintiff, as defendant seems prepared to do, for his past resistance to reinstatement, based at least in part on defendant's Title VII violation. There is, however, conceivably another party—the union—that should have an opportunity to be heard on the effect of plaintiff's delay in seeking reinstatement.

Plaintiff's counsel is not very imaginative as to what injunctive relief should be granted. Again, if disciplinary rules are to be tightened, the union may wish to be heard. Initiation of a sound educational program and a sound disciplinary rule may be proposed by the parties or may be obtained by consulting others, such as the Community Relations Service of the Department of Justice or the EEOC. If no more specific proposals are received, the court will be inclined to use portions of the remedial order in *EEOC v. Murphy Motor Freight*, 488 F.Supp. 381, 390 (D.Minn. 1980). *See also, Snell v. Suffolk County*, 611 F.Supp. 521, 531–2 (E.D.N.Y.1985), *aff'd*, 782 F.2d 1094 (2d Cir.1986).

Judgment will be entered in favor of plaintiff and against defendant on Count VIII of the Second Amended Complaint. Equitable relief will be granted after a hearing as to appropriate remedies. A conference to review procedural needs preliminary to such a hearing is scheduled in chambers for 4:00 p.m., February 20, 1986.[6] SO ORDERED.

---

6. Defendant may invite attendance of union counsel if desired and shall supply the union local with a copy of this memorandum and order. Except for defendant's ultimate liability for partial attorney's fees, the union's interest in equitable relief may be greater than that of Santa Fe.