In re REPRODUCTION SYSTEMS, INC., Debtor.

Kimberley D. NOBLET (now Kimberley D. Sanderford), Plaintiff,

v.

REPRODUCTION SYSTEMS, INC. and Robert Cash, Defendants.

Bankruptcy No. 89–40245–3–11.
Adv. No. 91–4062–3–11.

United States Bankruptcy Court, W.D. Missouri.

May 29, 1991.

Larry D. Harman, David C. Stover, Gunn, Shank & Harman, P.C., Kansas City, Mo., for plaintiff.

James E. Bird, Joseph R. Colantuono, Polsinelli, White, Vardeman & Shalton, P.C., Kansas City, Mo., for Reproduction Systems, Inc.

James L. Moeller, Gage & Tucker, Kansas City, Mo., for Robert Cash.

## MEMORANDUM OPINION AND PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

ARTHUR B. FEDERMAN, Bankruptcy Judge.

### I. Introduction

Plaintiff Kimberley Noblet Sanderford seeks damages and other relief from Reproduction Systems, Inc. and its Chief Executive Officer, Robert Cash, based upon alleged sexual harassment in the work place. Count I seeks relief under Title VII and the corresponding Missouri statute. Count II seeks damages for emotional distress and outrageous conduct. RSI filed a Chapter 11 bankruptcy petition on February 6, 1989, and is now operating pursuant to a Plan of Reorganization which was confirmed by this Court. With the agreement of all parties, this is a core proceeding as to debtor RSI, and is a proceeding that is otherwise related to a case under title 11 as to defendant Cash. Therefore, as to RSI this Court is authorized to enter an order directing that final judgment be entered (28 U.S.C. § 157(b)(1)). As to Cash, this Court is authorized to submit proposed findings of fact and conclusions of law to the District Court, which is authorized to enter any final order or judgment (28 U.S.C. § 157(c)(1)). I find that Plaintiff should be awarded nominal damages and injunctive relief as to Defendant Cash only, plus reasonable attorneys fees.

### II. Factual Background

1. This is not a case in which Plaintiff contends that she was required to submit to sexual relations as a condition of her employment, or in order to obtain advancement or promotion within the company. Instead, she contends primarily that statements of company personnel created a hostile work environment, that such work environment altered a term or condition of her employment and forced her to resign her position with the company, and that as a result she lost wages and suffered emotional distress and other damages.

2. Plaintiff, whose name was Kimberley Noblet throughout her employment with RSI, graduated from William Jewell College in 3½ years with degrees in both Communications and Public Relations. While in college, she was employed by the Clerk's Office in the Clay County Courthouse. Upon graduation she began work as a legal assistant at one law firm, and later took a similar position at a second law firm. (Tr. I–190–191) During her employment at the second firm a married attorney at that firm began sending her flowers and taking other actions which she considered inappropriate. Plaintiff discussed the matter with the partner who supervised her, and the inappropriate contacts promptly stopped. (II 81–83) She left that firm and went to work at RSI on March 2, 1987. Her leaving was prompted by her desire for a management opportunity and more money, and not by the incident involving the attorney.

3. Throughout the relevant time period RSI had fifteen or more employees. Robert Cash, along with his wife, owns all the stock in the company. Robert Cash also operated as Chief Executive Officer during the relevant time period, and was an "agent" of RSI. Therefore, within the meaning of 42 U.S.C. § 2000e, both RSI and Robert Cash are "employers" for Title VII purposes.

4. During her employment at RSI Plaintiff had three different jobs, and a number of different supervisors. Initially, she was Manager of Paralegal Services. Her immediate supervisors at that point were John Anderson, who is now the President of the company, and Doug Dixon. Mr. Anderson is a cousin of defendant Robert Cash. Later, one John Sanderford became her immediate supervisor. The Paralegal Services department was subsequently phased out and Plaintiff was offered a position as Sales Coordinator. As will be discussed, the circumstances under which this position was offered form part of the basis for her Complaint in this case. In any event, she began work as Sales Coordinator on or about November 14, 1988. Her immediate supervisor then was Sarah Wesley. On June 9, 1989 Plaintiff became Production Manager. Once again, John Anderson was her immediate supervisor.

5. Throughout this period of time the fortunes of RSI were in decline. In July 1988 all employees had been forced to accept a 10% cut in pay. As indicated, Plaintiff's Paralegal Services department had been phased out later that year. Thereafter a number of employees, some of them friends of Plaintiff, had been laid off. (Tr. I–233) Plaintiff herself periodically sent out resumes or took other steps to find new employment during 1988 and 1989, and declined a job offered by the Federal Reserve Bank in December, 1988.

6. At some point during 1989, Plaintiff began dating John Sanderford, who was still employed at RSI in a management position. Mr. Sanderford at that time was separated from his wife and in the process of obtaining a divorce.

7. On July 24, 1989, Plaintiff was treated by Dr. John L. Bean for headaches and related problems. Dr. Bean prescribed certain prescriptive drugs.

8. At the end of September 1989, Robert Cash invited Mr. Sanderford to use a condominium in Lake Tahoe which was owned by Mr. Cash. Apparently unbeknownst to Mr. Cash, Mr. Sanderford took the Plaintiff with him to Lake Tahoe.

9. On October 14, 1989, Plaintiff and John Sanderford agreed to be married the following spring. (Tr. I–51) Mr. Sanderford's divorce had become final that same month. On October 31 and November 7, 1989, Plaintiff and Mr. Sanderford had sessions with Michael R. Harrison, a psychologist in Liberty, Missouri. According to Plaintiff, these sessions were intended to be for pre-marital consultation. Neither Dr. Bean nor Dr. Harrison was called to testify at trial. Dr. Harrison's records indicate that Plaintiff and Mr. Sanderford discussed a number of matters with him, including the effect of his recent divorce, problems Plaintiff had had emotionally since childhood, and the fact that their employer was in Chapter 11. Plaintiff testified that she "may have" advised Dr. Harrison that she was the victim of sexual

harassment at work. Dr. Harrison's records contain no reference to such a problem. (Tr. II–45–46; Pl.Ex. 6)

10. On Friday November 10, 1989, Plaintiff drafted a letter of resignation addressed to Mr. Cash. (Pl.Ex. 3) Such letter was typed by her mother, and delivered by Plaintiff to Cash on Monday, November 13. Such letter states in part that Plaintiff's "decision to resign is based solely on the fact that sexual harassment, primarily from you, has made the work atmosphere intolerable."

11. Mr. Sanderford also drafted a letter addressed to Mr. Cash, and dated November 10. This letter was also typed by Plaintiff's mother. Mr. Sanderford's letter, which was also delivered November 13, accuses the company of submitting fraudulent figures to this court as part of the reorganization plan which was then pending for confirmation. Mr. Sanderford's letter also states that he no longer considers himself bound by any confidentiality agreement he may have signed concerning trade secrets. In so stating, Mr. Sanderford implicitly threatened to disclose client secrets, which disclosure would have been harmful to RSI.

12. In response to Mr. Sanderford's letter RSI terminated him immediately. (Def. Ex. 25; Tr. II–112–113) In response to Plaintiff's letter, giving two weeks notice of her resignation, she was told to clean out her personal belongings and was escorted out of the RSI premises immediately thereafter. She was paid for the next two weeks, though she was not allowed to work at RSI any longer.

13. Plaintiff and John Sanderford were married on March 31, 1990.

14. On November 20, 1989 Plaintiff filed a Charge of Discrimination with the Missouri Commission on Human Rights and the Equal Employment Opportunity Commission. On March 31, 1990 the EEOC issued a Notice of Right to Sue. Suit was subsequently filed in the United States District Court for the Western District of Missouri. (Case No. 90–0562–CV–W–8) That suit was dismissed without prejudice pursuant to the parties' agreement to pursue the matter as claims litigation in the RSI Chapter 11 proceeding.

### III. Plaintiff's Factual Allegations

15. As indicated, this case is based on Plaintiff's allegation that Defendants permitted an offensive working environment at RSI. Such offensive working environment, according to her, was based upon sexually suggestive comments by employees, particularly Robert Cash, and by the general use of profanity in her presence by various other RSI employees.

16. As to the general profanity claim, it appears that many RSI employees of both sexes were loose-lipped and enjoyed many jokes and stories, some of which had sexual overtones. (Tr. II–57; I–187) However, a number of other employees did not enjoy such ribald humor, and by their actions or words let their co-workers know that they did not appreciate such language being used in their presence. (Tr. I–170) There is no credible evidence to show that the Plaintiff took any meaningful steps whatever to show her displeasure with the dirty jokes or stories, or profanity, which were used by certain employees. In fact, the evidence did show that the Plaintiff herself sometimes used profanity. (Tr. I–170; Tr. I–225; Tr. II–7) These facts taken together, her silence about other people's profanity, her own profanity, and the fact that those not wanting to be subjected to such language were not so subjected, all combine to nullify any claim Plaintiff may have with respect to the general use of profanity by RSI employees.

17. The more troubling aspect of Plaintiff's claim concerns the sexually suggestive comments. Plaintiff contends that "numerous" such comments were made, particularly by Robert Cash, but also by John Anderson, who is now President of the company and is a cousin of Mr. Cash. According to Plaintiff, Mr. Cash was in the habit of putting his arm around her shoulder, drawing her toward him, and making such comments. In her letter of resignation, (Pl.Ex. 3) she referred to four specific

comments allegedly made to her by Mr. Cash.

18. The first incident referred to in the letter of resignation occurred in the Spring or Summer of 1989. (Tr. II–29) Mr. Cash made various remarks to the effect that Plaintiff "smelled good," whereupon Mr. Anderson, according to Plaintiff, "grabbed me and stuck his nose right on my neck and started sniffing." (Tr. I–198) In response, Plaintiff testified she told Anderson to stop, and he did. (Tr. II–30) She then "kind of laughed and walked off." (Tr. I–198) She also made a comment to John Sanderford, who was standing nearby, but testified that such comment could not be called a complaint. I find that this incident occurred. There was no evidence of any other incidents in which Mr. Anderson or anyone else touched Plaintiff in an offensive way.

19. The next incident referred to in the letter was Mr. Cash's allegedly asking Plaintiff "will you reproduce with me on machine eight?" (Tr. I–203; Exhibit 10), apparently referring to one of the copying machines located at RSI. This incident happened sometime between November 1988 and June 1989. (Tr. II–33–34) In response, the Plaintiff "laughed and then walked off." (Tr. I–204) Mr. Cash denies making the statement. (Tr. I–96) I find that this statement was made.

20. Another comment was made after Plaintiff and Mr. Sanderford returned from Lake Tahoe in early October 1989, when Mr. Cash allegedly stated that he couldn't believe "a beautiful blond slept in my bed without me." (Tr. I–204; I–183; II–17; II–37) In response to this comment, Plaintiff testified that she rolled her eyes and walked off. (Tr. III–242) I find that Mr. Cash did make such a statement.

21. The next incident referred to in the letter was when Plaintiff accidentally bumped into Mr. Cash, who then allegedly said "I love it when you rub up against me." (Exhibit 3; Tr. I–205; II–38). There is a discrepancy as to when this incident took place, but I find based on Plaintiff's testimony at trial that it occurred in mid to late October 1989, some two to four weeks before her resignation. Mr. Cash denied having made this statement. (Tr. I–97) I find that such statement was made by Mr. Cash.

22. On or before November 1988, Plaintiff alleges that Mr. Cash put his arm around her and asked if he could "rape, pilferage [sic] and discard" her. (Tr. I–201; II–30) Mr. Cash denies having made such a statement (Tr. I–97), despite the fact that his cousin, John Anderson recalled hearing it as well. (Tr. I–141) I find that the statement was made. In response, Plaintiff said "no" and "stomped off." (Tr. I–222) She also testified that she complained about this incident to John Sanderford, who was her supervisor at the time. (I–216) There is no evidence that Mr. Sanderford followed up on this complaint.

23. At trial, Plaintiff testified to certain statements made by Mr. Cash other than those specified in her letter of resignation. Sometime between November 1988 and June 1989 Mr. Cash allegedly put his arm around Plaintiff and said "will you have my baby?" (Tr. I–202; II–31). This statement was made in front of at least one other employee. (Tr. II–133) She said "no that's not very funny," and walked off. Mr. Cash denied making such statement (Tr. I–97), but I find that such statement was made.

24. In the late spring or early summer of 1987 Plaintiff was wearing a pair of athletic shorts because she played on the RSI softball team. Mr. Cash and Mr. Anderson started "whooping it up" about her shorts, and Mr. Cash then said "if you wore those shorts to work every day we could see what we could do about a raise." (Tr. I–199; II–29) Mr. Cash testified that he had no knowledge of this incident. (Tr. I–97). I find that it took place.

25. In May or June of 1989 Mr. Cash took Plaintiff to lunch. According to Plaintiff, Mr. Cash spent the whole lunch hour "saying that he preferred small breasts instead of large ones." (Tr. I–212; II–36) There is other evidence that, in Plaintiff's presence, Mr. Cash expressed to a male employee his preference for women with small "tits," "like Kim's". (Tr. II–134) I find that these statements were made.

26. During her employment at RSI, there were "numerous" sexual remarks made to Plaintiff, particularly by Robert Cash. Plaintiff did not feel that she could confront Mr. Cash directly about those remarks. (Tr. I–198; I–203)

27. RSI provides its employees with a handbook of personnel policies and procedures. (Tr. II–63) Such handbook states in part that "RSI will not tolerate sexual harassment by any of its employees." The handbook goes on to state that "[a]n employee or applicant who feels that he or she has been discriminated against due to his or her sex should report such incidents immediately to his or her supervisor, the Personnel Administrator, or any other member of management, without fear of reprisal ... RSI considers sexual harassment to be a major offense. Violations of this policy by any employee will not be permitted and may result in discipline up to and including discharge." (Pl.Ex. 2, page ER–7)

28. In 1986, prior to Plaintiff's employment at RSI, a female employee complained about a sexual remark that had been made to her by a male employee. An investigation was conducted, the statement was confirmed, and the male employee was immediately terminated. (Tr. II–154; III–218)

29. Plaintiff never submitted a formal grievance pursuant to the procedure outlined in the handbook. (Tr. III–217)

30. Plaintiff made certain general comments to members of management, other than Robert Cash, to the effect that RSI was going to have legal problems because of comments that were made to women. (Tr. I–221; II–40–41) In these general comments she did not specifically identify Robert Cash as the offender, and did not demand that action be taken to prevent such comments from being made in her presence.

31. There is no evidence that Defendant Cash approached any other female employees in an offensive manner.

## IV. Title VII and Missouri Human Rights Act Contentions

32. Both Title VII and the Missouri Human Rights Act make it an unlawful employment practice for an employer:

> to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin ...

42 U.S.C. § 2000e–2(a)(1); R.S.Mo. § 213.-055.

33. In *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), the United States Supreme Court recognized that Title VII encompasses harassment that, while not affecting the economic benefit, creates a hostile or offensive working environment. However, to be actionable, sexual harassment must be "sufficiently severe or pervasive 'to alter the conditions [of] employment and create an abusive working environment.'" *Id.*, 106 S.Ct. at 2406. See also, *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir.1982).

34. The Eight Circuit Court of Appeals has identified five elements to be proven in a sexual harassment claim which is based upon hostile work environment:

1. Plaintiff belongs to a protected group;
2. Plaintiff was subjected to unwelcome sexual harassment;
3. The harassment was based on sex;
4. The harassment affected a term, condition, or privilege of employment; and
5. The employer knew or should have known of the harassment in question and failed to take proper remedial action.

*Jones v. Wesco Co. Investment, Inc.*, 846 F.2d 1154, 1156 (8th Cir.1988). A Plaintiff who alleges sexual harassment does not have to demonstrate a "tangible loss' of an "economic character" in order to prove a Title VII violation. *Meritor Savings Bank v. Vinson*, supra; *Henson v. City of Dundee*, supra; *Huddleston v. Roger Dean Chevrolet, Inc.*, 845 F.2d 900 (11th Cir. 1988).

35. There is no dispute that Plaintiff belongs to a protected group, thereby satisfying the first element.

■ 36. I find that the remarks made by Mr. Cash constituted an unwelcome sexual harassment as to the Plaintiff. In *Hall v. Gus Construction Company*, 842 F.2d 1010, 1014 (8th Cir.1988), the Court stated as follows:

> In order to constitute harassment, the conduct must be 'unwelcome' in the sense that the employee did not solicit or invite it, and the employee regarded the conduct as undesirable or offensive.

There is no evidence that Plaintiff either solicited or invited Mr. Cash to make sexually suggestive remarks to her. It is correct that Plaintiff did not strongly object to such statements, for whatever reasons. Such objections would have aided her in demonstrating that the statements made to her were unwelcome. See *Perkins v. General Motors Corporation*, 709 F.Supp. 1487 (W.D.Mo.1989) (Bartlett, J.). However, for purposes of determining whether the statements constitute "unwelcome" sexual harassment, Plaintiff must simply demonstrate that she herself regarded such statements as undesirable or offensive and was reasonable in doing so. I find that Plaintiff was offended by these remarks, and given the nature of such remarks, was reasonable in being so offended.

■ 37. In order to demonstrate that "sexual harassment" occurred, Plaintiff must generally show a "campaign of harassment" that was "systematically directed [at her]," *Hall v. Gus Construction Company*, supra, 842 F.2d at 1014–16, and that the harassment is sustained and not trivial. *Moylan v. Maries County*, 792 F.2d 746, 749–50 (8th Cir.1986); *Scott v. Sears, Roebuck & Co.*, 798 F.2d 210, 214 (7th Cir.1986); *Rabidue v. Osceola Refining Co.*, 805 F.2d 611, 622 (6th Cir.1986).

38. The question of whether a defendant's statements or conduct constitute "sexual harassment" is closely related to the fourth element, which is that the harassment affected a term, condition or privilege of employment. In fact, the appropriate EEOC guidelines provide in relevant part as follows:

> Harassment on the basis of sex is a violation of Section 703 of Title IV. Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature, constitutes sexual harassment when ... (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment. 29 CFR Section 1604.-11(a).

A number of Courts have adopted the EEOC guidelines in sex harassment cases. See, e.g., *Henson v. City of Dundee*, supra, 682 F.2d at 904; *Bundy v. Jackson*, 641 F.2d 934 (D.C.Cir.1981).

■ 39. In effect, the second and fourth elements, along with the EEOC guidelines, provide that the state of psychological well-being of the employee is a term, condition, or privilege of employment. *Henson v. City of Dundee*, supra. In other words, Title VII guarantees that a member of a protected group should be allowed to get up in the morning and go to work without undue fear of her employer or co-workers making offensive remarks to her. That doesn't mean that every member of a protected group has a cause of action if an "isolated" statement is made. (See, *Perkins v. General Motors Corporation*, 709 F.Supp. 1487 (W.D.Mo.1989)). Nor is such a worker protected from statements which are merely "annoying". (*Rabidue v. Osceola Refining Co.*, 584 F.Supp. 419 (E.D.Mich.1984), aff'd 805 F.2d 611 (6th Cir.1986). But at some point, such occasional remarks take on a life of their own and create an atmosphere which a worker can reasonably find offensive. In this case, two factors are critical to my finding that the series of remarks by Mr. Cash constituted sexual harassment which affected a term, condition, or privilege of employment. First, the remarks made by Mr. Cash to Plaintiff were not typical off-color jokes or similar generic comments. Instead, they were directed to Plaintiff and concerned her own body and her own sexual conduct. They were not isolated re-

marks, but were a part of Plaintiff's working environment at RSI. Simply put, Mr. Cash got a kick out of making sexually suggestive remarks to Plaintiff, particularly in front of her co-workers. The second factor which makes Mr. Cash's statements more threatening then they otherwise might be is his position with the company. Mr. Cash owns RSI. That made his statements even more embarrassing to Plaintiff when made in front of her fellow workers. It also made it much more difficult for Plaintiff to protest such statements, thereby further contributing to their impact on her. These were not isolated incidents. Nor were they merely annoying. Plaintiff was embarrassed and humiliated, (Tr. II–70), and properly so.

Clearly, Plaintiff had emotional difficulties during at least a portion of the time during which she was employed at RSI, and just as clearly there were a number of factors—both at work and at home—which contributed to those difficulties. (Tr. II–45; Tr. II–89) Plaintiff had also had some unspecified emotional trauma during her childhood. (Tr. II–114) The series of remarks made by Mr. Cash were not the sole, or even the major cause of her emotional difficulties. However, Plaintiff is not obligated to prove that much. Instead, she must demonstrate that the remarks constitute sexual harassment which "affected" a term, condition, or privilege of employment. "To bring an actionable claim for sexual harassment because of an intimidating and offensive work environment, a plaintiff must establish, by the totality of the circumstances, the existence of a hostile or abusive working environment which is severe enough to affect the psychological stability of [the] employee." *Andrews v. City of Philadelphia*, 895 F.2d 1469 (3rd Cir.1990). I find that Mr. Cash's remarks did constitute such sexual harassment, and that they were sufficiently pervasive under the circumstances so as to alter the conditions of her employment and create an abusive working environment. They therefore constitute sexual harassment which affected her employment.

40. The third prong of the test requires plaintiff to prove that the harassment was based on sex. To meet this test, Plaintiff is required to prove "but for the fact of her sex, that she would not have been the object of harassment." *Henson*, 682 F.2d at 904. Defendants contend that Plaintiff has not so proven because at RSI sexual jokes or comments were made in the presence of both male and female employees. However, as indicated, Plaintiff's cause of action is not based just on such generic comments. Instead, it is based primarily on a series of remarks by Robert Cash which were directed specifically to her. There is no question that but for the fact of Plaintiff's sex, she would not have been the object of such comments. Therefore, this prong is met as well. See *Bundy v. Jackson*, supra, 641 F.2d at 942 n. 7; *Henson v. City of Dundee*, supra, 682 F.2d at 904.

41. The fifth element in any claim for sexual harassment based upon a hostile environment is that the employer knew or should have known of the harassment in question and failed to take proper remedial action. It should be noted that for these purposes both RSI and Mr. Cash are "employers". Title VII defines the term "employer" to mean "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, *and any agent of such a person . . ."* 42 U.S.C. § 2000e(b). Since Mr. Cash himself committed the acts which are the core of the sexual harassment claim, and since he is one of the principal owners of RSI, I find that both Defendants knew or should have known of the harassment in question.

42. Based on the above, Plaintiff has made out a cause of action against both Defendants for sexual harassment which constitutes an unlawful employment practice under Title VII and Mo.Rev.Stat. § 213.055.

43. The next issue concerns remedies. Title VII provides as follows:

*Injunctions; appropriate affirmative action; equitable relief; accrual of back pay; reduction of back pay; limitations on judicial orders*

(g) If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate. Back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission. Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable. No order of the court shall require the admission or reinstatement of an individual as a member of a union, or the hiring, reinstatement, or promotion of an individual as an employee, or the payment to him of any back pay, if such individual was refused admission, suspended or expelled, or was refused employment or advancement or was suspended or discharged for any reason other than discrimination on account of race, color, religion, sex, or national origin or in violation of section 2000e(a) of this title.

44. Plaintiff does not seek to be reinstated to her previous employment. (Tr. II–16) Instead, she simply seeks compensatory damages for a portion of the medical costs incurred by her, back pay for in excess of two months in which she was unemployed after resigning from RSI, as well as the difference between the salary in her current job and the higher amount she was receiving while employed at RSI. Plaintiff also seeks punitive or exemplary damages. Finally, Plaintiff asks that an injunction be entered against the Defendants ordering them to cease and desist from any harassment or discrimination against Plaintiff, or other employees, based upon their sex, for an order commanding the Defendants to take such remedial steps as are necessary to prevent such actions from occurring in the future, and for the costs and expenses of this action, including reasonable attorneys fees. Although Plaintiff in the original complaint sought reinstatement, she at trial withdrew that portion of her prayer.

■ 45. A court which determines that a violation of Title VII has occurred is required to consider two goals in fashioning appropriate relief. First, the Court should take such steps as are necessary to insure that the employer does not engage in prohibited practices in the future. This goal can, of course, be accomplished through the injunctive powers granted by Title VII. Secondly, the Court should take such steps as are necessary to restore plaintiff to the position she would have been in had the violation not occurred. Thus, in the event an employee is terminated by virtue of a Title VII violation, the court can order that such employee be reinstated, with back pay less the amount which would have been earnable with reasonable diligence by the plaintiff during the period after the unlawful termination. The same analysis holds true in a case of constructive discharge. Thus, if plaintiff is in effect forced to resign her position as a result of sexual harassment, the court could order that she be reinstated with back pay, and that the conditions resulting in her constructive discharge be rectified.

■ 46. The first problem with Plaintiff's claim for back pay is that she does not seek reinstatement. In any event, however, in order to be entitled to reinstatement and/or back pay she would need to demonstrate that she was constructively discharged as a result of the Title VII violation. This she has not shown. While the actions of Mr. Cash and his company did constitute illegal sexual harassment under Title VII, there is no credible evidence to demonstrate that Plaintiff was forced to leave the company as a result of such harassment. Her letter of resignation states that her decision to resign "is based solely on the fact that sexual harassment,

primarily from you, has made the work atmosphere untolerable [sic]." This letter is nothing but self-serving, and was written in such form so as to create a basis for this litigation. The evidence shows that during this period of time, Plaintiff had a number of personal problems, as well as a number of complaints about the RSI operation. The company was in Chapter 11 and she did not believe it was being run properly. Fellow employees were being laid off due to the contraction of the company's business. (Tr. I-223; I-227) Plaintiff herself at various times sought employment elsewhere. In addition, while employed at RSI she began a relationship with John Sanderford resulting in their marriage. Mr. Sanderford's divorce, as well as the vestiges of his relationship with his former wife, caused uncertainty and anxiety to Plaintiff. Plaintiff was also concerned about the impact which working at the same business would have on her marriage to Mr. Sanderford, and in particular whether the two of them would be able to leave their work-related problems at the doorstep when they got home. These and similar problems were discussed by Plaintiff with both Dr. Bean and Dr. Harrison. (Tr. II-45-46) Plaintiff testified that she "may have" mentioned her sexual harassment difficulties to Dr. Bean while consulting him. However, that falls far short of proving that she was constructively discharged as a result of such sexual harassment. As previously shown, the latest statement made by Mr. Cash to Plaintiff occurred sometime between the middle and end of October, 1989. Yet she did not submit her resignation letter until November 13, 1989. There is no evidence to show that any additional incidents occurred in the interim. And, while she did consult Dr. Bean on both October 31, and November 7, 1989, as indicated there is scant evidence that Mr. Cash's statements were even discussed. The same is true with respect to a conversation she had with John Anderson on or about October 5, 1989. (Tr. I-168; Def. Ex. 23; Tr. I-174) While she complained about a number of problems she was having, sexual harassment was not one of them. (Tr. II-50)

47. Plaintiff contends that she was effectively discharged when, on November 13, 1989 she was escorted out of the building "like a common criminal". The problem with this argument, of course, is that she was only escorted out after she had submitted her letter of resignation. While her letter of resignation indicated that she planned to work an additional two weeks, she was abruptly told to leave immediately. However, RSI paid her for those two weeks. In any event, RSI's actions in removing her immediately were appropriate under the circumstances. On that same date, November 13, her fiance, Mr. Sanderford, had also tendered a letter to RSI. (Tr. I-72) That letter first accused the company of committing fraud. It then went on to state that Mr. Sanderford, who is himself a lawyer, no longer considered himself bound by any confidentiality agreement he may have signed with RSI concerning trade secrets. RSI provides copying services for law firms and other professionals. Understandably, such professionals require that RSI and its employees not disclose the contents of documents to any other person. RSI therefore requires its employees to agree not to make any such disclosure. Mr. Sanderford's bald threat goes to the core of RSI's business, and had to be taken very seriously by management. In view of that fact, and in view of Mr. Sanderford's relationship to Plaintiff, and particularly in view of the fact that both letters were delivered on the same date, RSI was certainly justified in escorting Plaintiff out without according her the privilege of working an additional two weeks for no extra pay. I find that Plaintiff was not constructively discharged as a result of the Defendant's sexual harassment and that, for this additional reason, she is not entitled to the back pay she seeks.

48. In addition to back pay, Plaintiff is seeking compensatory damages for emotional distress, and pain and suffering. Based on the clear language of Title VII, our circuit has found that such compensatory damages are not available in Title VII cases. In so holding, the Court of Appeals

set forth three reasons for the unavailability of compensatory damages under Title VII. "First the language of the statute offers only equitable relief, such as reinstatement, whereas compensation for humiliation and emotional suffering is a form of legal relief. Second, the legislative history indicates that the damages provision of Title VII was modeled on a provision of the National Labor Relations Act dealing with unfair labor practice which has been interpreted not to permit an award of compensatory damages. Third, because Congress has explicitly provided for compensatory damages in other statutes addressing discrimination, *See, e.g., Fair Housing Laws,* 42 U.S.C. §§ 3601–3631 (1976 & Supp. V 1981), it is logical to read the absence of such provision in Title VII as a conscious choice by Congress not to make those damages available in a Title VII action ..." *Muldrew v. Anheuser–Busch, Inc.,* 728 F.2d 989, 992, n. 2 (8th Cir.1984). *See also, Wilmington v. J.I. Case Co.,* 793 F.2d 909, 922, n. 9 (8th Cir.1986); *Williams v. Atchinson, Topeka, & Santa Fe Railway,* 627 F.Supp. 752, 757 (W.D.Mo.1986) (Sachs, J.); *Swanson v. Elmhurst Chrysler Plymouth,* 882 F.2d 1235 (7th Cir.1989). The award of strictly equitable relief under Title VII sexual harassment cases has been criticized, because in many cases the real damages might be the pain and suffering of the victim. (*See, e.g.* Levy, *Righting the "Unrightable Wrong": A Renewed Call for Adequate Remedies Under Title VII,* 34 St. Louis University Law Journal 567, at 571 (1990)). Nevertheless, it is well established that Title VII claimants are not entitled to recover for damages caused by emotional distress or pain and suffering.

■ 49. The remedial shortcomings of Title VII have caused a growing number of Courts to award "nominal" damages as a form of "public vindication" of the harm done to plaintiff (*Gray v. County of Dane,* 854 F.2d 179, 181 (7th Cir.1988)), and more importantly, to create a remedy on which to base an award of costs and attorneys fees. See, *Bowen v. City of East Chicago, Indiana,* 799 F.2d 1180, 1184 (7th Cir. 1986). A number of circuits have suggested that nominal damages might be available. *Katz v. Dole,* 709 F.2d 251, 253, n. 1 (4th Cir.1983); *Henson v. City of Dundee,* 682 F.2d 897, 905–906 and n. 12 (11th Cir. 1982); *Joshi v. Florida State University,* 646 F.2d 981, 991, n. 33 (5th Cir.1981), *cert. denied* 456 U.S. 972, 102 S.Ct. 2233, 72 L.Ed.2d 845 (1982); *T & S Service Associates v. Crenson,* 666 F.2d 722, 728, n. 8 (1st Cir.1981). It should be noted that the Seventh Circuit has specifically rejected nominal damages, reasoning that Title VII does not provide for such a remedy. *Gray v. County of Dane,* supra; *Bowen v. City of East Chicago, Indiana,* supra.

As indicated, our own Eighth Circuit has held that compensatory damages for humiliation and emotional stress are not an available remedy under Title VII. Nevertheless, the Eighth Circuit has approved an award of nominal damages in a situation similar to this one. In *Dean v. Civiletti,* 670 F.2d 99 (8th Cir.1982), the court found plaintiff entitled to recover nominal damages based on the district court's finding that plaintiff had been discriminated against in violation of Title VII, even though the violation had not resulted in any loss for which economic or injunctive relief is available under Title VII.

*Muldrew v. Anheuser–Busch, Inc.,* 728 F.2d 989 (1984) does not directly address the issue of nominal damages. It prohibits only the award of damages for "humiliation and emotional suffering." *Id.,* 728 F.2d at 992, n. 2. *Dean,* which mandated nominal damages in a Title VII case, was cited for that specific issue by the court *en banc* in *Fast v. School Dist. of City of Ladue,* 728 F.2d 1030, 1034 (8th Cir.1984). *Fast* was decided February 23, 1984; *Muldrew* was decided February 21, 1984. Thus, in this circuit, nominal damages are permitted in a case, such as this, where plaintiff has proven a Title VII violation but cannot recover damages for humiliation or emotional distress.

Based upon the above analysis, nominal damages of one dollar will be awarded to Plaintiff under Title VII. As will be explained later, such damages will be awarded only against Defendant Cash, and not RSI.

50. Thus, Plaintiff is not entitled to back pay or actual damages, but is entitled to nominal damages. This award of nominal damages is also based on the provisions of the Missouri Human Rights Act, Mo.Rev.Stat. § 213.055, since the remedial provisions of that statute are not as restrictive as those under Title VII. Mo.Rev.Stat. § 213.111(2) provides:

2. The court may grant as relief, as it deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order, *and may award to the plaintiff actual and punitive damages,* and may award court costs and reasonable attorney fees to the prevailing party, other than a state agency or commission; except that a prevailing respondent may be awarded court costs and reasonable attorney fees only upon a showing that the case is without foundation. (emphasis supplied) [1]

Thus, under Missouri law, the court has the discretion to award actual and punitive damages, and attorneys fees. Unlike the federal provisions, an aggrieved party is not strictly limited to equitable relief under Section 213.111(2). I find that like the Title VII cause of action, Plaintiff has satisfied her burden of proof with respect to all five elements necessary to prove sexual harassment. I further find, however, that there was inadequate proof as to the amount of damages resulting from such sexual harassment. As stated previously, Plaintiff is not entitled to back pay because she has not proven that she was constructively discharged as a result of the sexual harassment. The other category of damages for which proof was offered was medical costs incurred due to stress. Plaintiff contends that while there were many factors contributing to such stress, the sexual harassment caused by Mr. Cash's statements and actions contributed in part to her stress. The only evidence of medical costs, however, consists of a ledger from a doctor showing the amount paid by Plaintiff for medical

care. (Pl.Ex. 6) The total of those medical charges is $413, apart from the charge for copying records in connection with this litigation. The problem with this proof is that the first visit to such doctor took place on February 26, 1987, which was approximately a week before she even started working for RSI. The bulk of these charges were incurred in 1987, while the bulk of the statements constituting sexual harassment occurred later. In short, there is no evidence that the medical expenses for which proof was offered were incurred as a result of the sexual harassment to which Plaintiff was subjected.

51. As shown, the Missouri Statute does allow recovery of actual damages. And, under Missouri law, nominal damages may be awarded in lieu of actual damages where there is an inadequate showing as to the quantum of damages. *Lampert v. Judge and Dolph Drug Co.,* 238 Mo. 409, 141 S.W. 1095 (1911). Here, although a violation of the Missouri Human Rights Act has been shown, the amount of damages resulting from such violation has not been shown. Therefore, an award of nominal damages of one dollar is appropriate. Such damages will be awarded against defendant Robert Cash only. To the extent that there have been any violations of Title VII, such violations were the direct result of Robert Cash's actions. RSI itself has an appropriate policy for dealing with Title VII violations. Furthermore, RSI is operating pursuant to a Chapter 11 Plan of Reorganization which requires that it make payments to its creditors over a number of years. As a result of the award of nominal damages to Plaintiff, such prevailing party will also be entitled to an award of attorney's fees. The creditors of RSI have already been victimized by Mr. Cash's actions. RSI has spent thousands of dollars defending itself in this case and that expense makes it less likely that such creditors will recover the amounts due them. It should be Mr. Cash, and not those credi-

---

1. Note that this provision was included in a 1986 amendment to the Missouri Human Rights Act. Prior to that time, the Missouri remedy provisions were similar to those contained in Title VII. Compare, R.S.Mo. § 296.040 (repealed 1986). However, since Plaintiff did not begin work at RSI until after the effective date of the 1986 amendments, she is entitled to their benefit.

tors, who pays any amounts owed to Plaintiff and her counsel.

■ 52. The Missouri Human Rights Act also allows for the recovery of punitive damages. No such punitive damages should be awarded here. "To be assessed punitive damages, defendant must not only have intended to perform the act which is ascertained to be wrongful but must have known it was wrongful when he did it." *Shillings v. Purolater Courier Corp.*, 824 F.2d 660 (8th Cir.1987), quoting *Stark v. American Bakeries Co.*, 647 S.W.2d 119, 123 (Mo.1983) (en banc). Plaintiff never specifically advised Robert Cash that she considered his statements to her to be sexual harassment. Nor did she formally complain to RSI. In any event, to the extent the fact finder has discretion in the award of punitive damages, such damages are not appropriate here under all the circumstances.

■ 53. The next available remedy to consider is injunctive relief, which is available under both Title VII and the Missouri Human Rights Act. Injunctive relief generally should be granted in Title VII cases unless there is no reasonable expectation that the discriminatory conduct will recur. *United States v. W.T. Grant Company*, 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). In fashioning appropriate injunctive relief, it is necessary for the Court to require such steps as are necessary to reasonably insure that the illegal conduct to which the Plaintiff was subjected does not recur. However, a Court must also make the injunction specific enough that the persons affected by it can understand how they are required to act. As indicated at the outset, Plaintiff in this case complained of two general types of statements. The first were the generic type sexual jokes which seemed to be a part of every day conversation at RSI. As stated previously, however, those jokes and statements did not make out a cause of action under Title VII because those employees who expressed a desire not to be subjected to such language appear to have had their wishes respected. The sexual harassment which has been found to have existed resulted from statements made about Plaintiff herself. Such statements were made almost exclusively by Robert Cash. An Order which enjoined RSI and all of its employees from engaging in the type of conduct of which they have been accused would not be appropriate given that such conduct has not been found to have resulted in a Title VII violation. And, such an Order would not fairly guide such persons on how they should conduct themselves in the future. Furthermore, RSI has an appropriate policy for dealing with employment discrimination. That policy has worked in the past when appropriate complaints were made about the conduct of employees. Finally, as stated before, I am not unmindful of the impact which the injunction might have on RSI's future operations. Compliance with any injunction would require additional cost and expense which should not have to borne by the creditors of RSI.

54. The same is not true, however, for Robert Cash. Mr. Cash can, and should, be enjoined from committing any such violations in the future. RSI has a specific policy in place which prohibits its employees from engaging in verbal or physical conduct which substantially interferes with any employee's work performance or creates an intimidating, hostile, or offensive work environment. Mr. Cash must scrupulously observe that policy and the law upon which it is based. As indicated, I have substantial concern about the expense incurred by RSI and its creditors as a result of Mr. Cash's actions. I have considered the possibility of requiring Mr. Cash to reimburse RSI for the cost and expenses incurred by it in defending this action. However, I have chosen not to do that this time. Suffice it to say that in the future any actions of Mr. Cash which violate the injunction to be imposed as a result of findings herein will be dealt with harshly.

■ 55. As to Count I, that leaves the issue of attorneys fees. Both Title VII and the Missouri Human Rights Act allow the Court to grant the prevailing party court costs and reasonable attorneys fees. Plaintiff has proven a violation of both statutes, and has been awarded nominal damages.

In addition, I have found that injunctive relief is appropriate. If the Plaintiff has succeeded on "any significant issue in the litigation", she has crossed the threshold to a fee award of some kind. *Texas State Teachers Assoc. v. Garland Indep. School District*, 489 U.S. 782, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989); *Le Bon Pain, Inc. v. Guyon and Co., Inc.*, 720 F.Supp. 983 (S.D.Fla.1989). In our circuit, nominal damages alone have been found sufficient to justify an award of attorneys fees, even in the absence of injunctive relief being ordered. *Dean v. Civiletti*, supra, 670 F.2d at 101. Plaintiff has succeeded on the central issue in the suit, establishing that she was subjected to a Title VII violation. As a result, Plaintiff is a prevailing party who should be allowed to recover attorneys fees and costs from Robert Cash. In determining the amount so recoverable, the Court will certainly consider the fact that Plaintiff has not been awarded all the relief requested in her complaint.

### V. Emotional Distress or Outrageous Conduct Claim

■ 56. Count II is entitled "Emotional Distress." Count II could be read to be making a state law claim for emotional distress on the basis of either a prima facie tort or outrageous conduct. There are at least two reasons that this claim must fail. First, the exclusive remedy for work-place sexual harassment which causes a common law injury (as compared to a Title VII or other statutory injury) is the Workers Compensation System. *Harrison v. Reed Rubber*, 603 F.Supp. 1456 (E.D.Mo.1985); *Hollrah v. Friederich*, 634 S.W.2d 221, 223 (Mo.App.1983). And second, one necessary element of a prima facie tort is injury to the Plaintiff. As stated above, I find that there is insufficient proof of injury to the Plaintiff. Thus, Plaintiff is not entitled to judgment on Count II of her complaint.

### VI. Procedural Matters

57. The procedural circumstances of this case and the Court's decision to award attorney fees require the following. Counsel for Plaintiff is permitted ten (10) days after being served with this Memorandum Opinion to file an application for approval of attorneys fees and to serve it upon counsel for the defendants. Counsel for Robert Cash is permitted ten (10) days in which to respond to said fee application. If any dispute arises over the fees, the parties shall have ten (10) days to attempt to resolve these differences. If no resolution is achieved, then a hearing on attorneys fees shall be held.

In addition, since that portion of this proceeding involving Robert Cash is a non-core related proceeding, this Memorandum Opinion shall constitute the Court's proposed findings of fact and conclusions of law pursuant to Federal Bankruptcy Rule 9033(a) as to him. As such, Federal Bankruptcy Rule 9033(b) provides that Plaintiff and Cash shall have 10 days after being served with the proposed findings and conclusions to serve and file written objections with the Clerk of Bankruptcy Court, which identify and specify the findings and conclusions objected to and the grounds for such objection. Each such party has ten (10) days after being served the other party's objections to serve and file with the Clerk of the Bankruptcy Court responses to the objections. Since a transcript has already been prepared, no transcript need to be ordered by the parties. Once the parties have submitted objections, if any, and responses, if any, the Court shall transmit its proposed findings and conclusions to the District Court for its review along with the objections and responses.

In addition, since that portion of this proceeding involving RSI is a core proceeding, the Court shall delay entry of judgment of this matter until after the attorneys fees are decided by the Court.

It is the Court's intention that a final, appealable order be entered in the core proceeding simultaneously with the transmittal to the District Court of the proposed findings and conclusions, and objections and responses, if any, in the non-core proceeding.