In re Danny SOTELO and Jacqueline Jean Sotelo, Debtors.

Anna Nell AVERY, Plaintiff,

v.

Danny SOTELO, et al., Defendants.

Bankruptcy No. 93–09951–H7.
Adv. No. 93–91035–H7.

United States Bankruptcy Court,
S.D. California.

March 8, 1995.

Robert H. Swensen, Law Offices of Robert H. Swensen, Tustin, CA, for plaintiff.

James S. Ready, Carlsbad, CA, for debtors/defendants.

## MEMORANDUM DECISION

JOHN J. HARGROVE, Bankruptcy Judge.

This is a claim for general and punitive damages resulting from alleged sexual harassment. Plaintiff contends that the sexual harassment constitutes willful and malicious injury under 11 U.S.C. § 523(a)(6) and that all damages resulting therefrom are non-dischargeable.

This court has jurisdiction to hear this matter pursuant to 28 U.S.C. § 1334 and § 157(b)(1) and General Order No. 312–D of the United States District Court, Southern District of California. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

### FACTS

Anna Nell Avery ("Avery"), was employed from 1980 until 1989 as a lead inspector by Ford Aerospace Corporation ("Ford"). As lead inspector, Avery supervised the assembly of component parts of the guidance portion of guided missiles. In 1988, defendant Danny Sotelo was employed by the Department of Defense Contract Administration Services ("DCAS"). Sotelo maintained an office at the Ford plant in Newport Beach, California, and was in charge of inspecting the guided missile components prepared under Avery's lead inspection. Sotelo had authority to either approve or disapprove the individual missile system for purchase by the government. Additionally, Sotelo was authorized to issue a Quality Deficiency Report ("QDR"). A QDR can reject for purchase any missile component produced by Ford. Because of the cost factors associated with reworking a product rejected by QDR and the possible effects which a QDR might have on contract renewal with the United States government, QDR's were viewed as extremely unfavorable by Ford's staff and line management.

Avery testified that from May 1988 through October 19, 1988, Sotelo engaged in repeated acts of sexual harassment against her, including verbal sexual insults. He also displayed an advertisement of a woman wearing a negligee in a provocative sexual manner and suggested to Avery that he wanted to see her in such a position. He also repeatedly suggested to Avery that he wanted to see her in a "tiny bikini." Sotelo also sang the song "Teeny Weeny Bikini" in Avery's presence. Avery testified that she made it clear that his comments were not welcome or appreciated. She finally reported Sotelo's conduct to her supervisor, Charlene Webb, and asked her to intervene. However, Avery testified that Webb told her to go along with Sotelo and to "act dumb" and "girlish" around him and to play along with him and to do "anything I had to do to avoid a QDR." Additionally, Avery testified

that Sotelo repeatedly referred to her as "sexy" and suggested to her that she perform oral sex upon him. She specifically testified that Sotelo told her that "not all women give good head, I bet you give head." She further testified that he threatened to use his position with DCAS to write up QDR's on missile components which Avery and her team inspected.

Avery began experiencing headaches, upset stomach, diarrhea, tachycardia and panic attacks. In early June 1988, Avery suffered stomach cramps and excruciating pain in her lower abdomen. She left work and went to see her physician who recommended that she stay off work, which she did for 18 days.

When her supervisor, Charlene Webb, refused to take action against Sotelo, Avery complained to Ford's Industrial Relations Department. In response to her complaint, Sotelo's work station was moved away from her work area. On October 19, 1988, Sotelo informed Avery that he was writing a QDR on her and her section for a specific security violation. Avery testified that she showed Sotelo the manual which expressly permitted the act which Sotelo contended was a security violation. Sotelo responded that he was going to write the QDR anyway and then stated to Avery, "Aren't you the one who doesn't like to give head?" Avery testified that she understood that Sotelo's remark was given in retaliation for her complaints to Ford about Sotelo's conduct and for her refusal to submit to sexual harassment.

Avery testified that on October 21, 1988, she met with Robert H. Swenson, her attorney in this case. Avery testified that Swenson spent several hours listening to the facts of her case, agreed to take the case and then called Sotelo and told him to cease his harassment against Avery. According to Avery, Swenson also notified Sotelo that he would be filing a lawsuit against him.

Avery testified that on October 22, 1988, she received a telephone call from an unknown female who initially used some profanity and then told Avery to, "back off—or you're dead!" Avery testified that the phone call took just a few seconds and that she did not recognize the voice of the female caller.

She indicated that it was definitely not her supervisor Charlene Webb.

Following the phone call, Avery suffered a complete mental collapse and was hospitalized at Santa Ana Psychiatric Hospital from October 22, 1988 to November 28, 1988.

Upon her return to work, Avery was demoted from her position as lead inspector due to the recommendation of her physician that she not be placed in a stressful position. In 1993, Avery was laid off due to a job cut back program. She testified that she would not have been laid off if she had still held the position as lead inspector because lead inspectors were exempt from the lay off.

Sotelo denied engaging in any acts of sexual harassment.

The court believes Avery's testimony. This court has had the opportunity to observe both plaintiff and defendant testify. The court found Avery to thoughtfully consider each question posed and to answer her questions carefully and precisely. Avery's testimony was unwavering and adamant at times regarding the nature and extent of Sotelo's conduct.

In addition, portions of Avery's testimony were corroborated by Sotelo himself. Specifically, Sotelo admitted that he carried an advertisement for lingerie to work with him. He testified that the advertisement appeared in the Orange County Register on behalf of Broadway stores. He testified that he had been recently married on December 19, 1987, and that he saw the ad and kept it since he planned to buy an item for his wife. He kept it in a folder which he carried at work. Sotelo admitted that the ad could be seen when his work folder was open. He also admitted that his work station was only 4 or 5 feet from Avery's position at the end of a production line. Sotelo also admitted that from time-to-time he would sing or hum the song about a "teeny weeny polka-dot bikini" while at work, but claimed that he did not do this to offend or annoy anyone. He also testified that when Avery became ill and missed work in June 1988, he signed a get well card presented by a number of fellow Ford employees. Sotelo signed the card with, "I Dream of Annell, in a teeny Bikini.

Hurry back sexy, /s/ Dan." Sotelo testified that this was not meant to be a suggestive comment. The court finds that all of these admissions corroborate plaintiff's testimony regarding the specifics of the sexual harassment, despite Sotelo's denial.

## DISCUSSION

Section 523(a)(6) of the Bankruptcy Code provides:

> (a) A discharge under ... this title does not discharge an individual debtor from any debt—
>
> ...(6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

11 U.S.C. § 523(a)(6).

█ In order for the debt to be nondischargeable under § 523(a)(6), Avery must prove by a preponderance of the evidence that Sotelo's actions were "willful and malicious." *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991). "The Ninth Circuit has defined 'willful and malicious' as a 'wrongful act ... done intentionally, [which] necessarily produces harm and is without just cause or excuse ... *even absent proof of a specific intent to injure.*'" *In re Gee*, 173 B.R. 189, 191–92 (9th Cir. BAP 1994) (alterations in original) (quoting *In re Cecchini*, 780 F.2d 1440, 1443 (9th Cir.1986)).

In *In re Gee* the Bankruptcy Appellate Panel ("BAP") for the Ninth Circuit discussed each of the elements needed to find a judgment debt non-dischargeable under § 523(a)(6):

### 1. Willful.

The term "willful" means "deliberate or intentional." H.R.Rep. No. 595, 95th Cong., 2nd Sess. 365 (1978), U.S. Code Cong. & Admin. News 1978, pp. 5787, 6320. In *In re Britton*, 950 F.2d 602, 605 (9th Cir.1991), the Ninth Circuit held that a debtor's actions are "willful" under § 523(a)(6) if the debtor intended to perform the wrongful act.

\*    \*    \*    \*    \*    \*

### 2. Malicious.

In order to show "malice" under § 523(a)(6), a creditor must show: (a) that the debtor committed a wrongful act; (b) the act necessarily produced harm; and (c) the act was without justification or excuse. *In re Littleton*, 942 F.2d 551, 554 (9th Cir.1991). The phrase "necessarily produced harm" has been interpreted to mean that the "act must be targeted at the creditor, at least in the sense that the act is certain or almost certain to cause financial harm." *Littleton*, 942 F.2d at 555, quoting *In re Littleton*, 106 B.R. 632, 638 (9th Cir. BAP 1989) (emphasis omitted). The Ninth Circuit further refined its definition of malice by ruling that a creditor must show that the debtor had actual knowledge or the reasonable foreseeability that his conduct might result in injury to the creditor. *Britton*, 950 F.2d at 605.

### (a) Wrongful Act.

\*    \*    \*    \*    \*    \*

Wrongful acts include conduct that infringes on the rights of others, particularly those rights protected by state or federal statutes. *See In re Moore*, 1 B.R. 52 (Bankr.C.D.Cal.1979) (debtor's acts of racial discrimination against minority tenants in violation of certain federal civil rights laws were "malicious" under former Section 17(a)(8) of the Bankruptcy Act of 1978).

### (b) Act Necessarily Produced Harm.

\*    \*    \*    \*    \*    \*

As noted above, the Ninth Circuit has ruled that this element of maliciousness is satisfied by evidence that the debtor knew that his actions would injure the creditor *or* that it was reasonably foreseeable that the debtor's actions would injure the creditor. *Britton*, 950 F.2d at 605.

*In re Gee*, 173 B.R. at 192–93.

The final element of "malicious" set forth in *Gee*, is that the act be done without justification or excuse. *Id.*, at 193.

█ In this case Avery was forced to take 11 days leave in June 1988 because of Sotelo's remarks. When she returned, he continued to harass her again in October 1988, causing her complete mental and physical

collapse and hospitalization. This court finds that Sotelo's actions were deliberate and intentional, thereby meeting the "willful" requirement.

Sotelo's statements and acts were wrongful. His conduct clearly violated the Fair Employment & Housing Act, (Cal.Gov. Code § 12900 et seq., (West Supp.1995)), which makes sexual harassment an unlawful employment practice, as well as Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U.S.C. § 2000e et seq., which prohibits discrimination based on sex with respect to compensation, terms, conditions or privileges of employment. 42 U.S.C. § 2000e–2(a)(1). Sotelo's acts meet the definition of sexual harassment set forth in the Equal Employment Opportunity Commission's Guidelines on Discrimination Because of Sex, which includes "[u]nwelcome sexual advances, requests for sexual favors, and/or verbal or physical conduct of a sexual nature." 29 C.F.R. § 1604.11(a) (1985).

Sotelo offered no evidence to justify or excuse his conduct, thus this element is also established.

■ The only remaining element is that the acts of Sotelo "necessarily produced harm" to Avery. Sotelo argues that Avery has failed to produce evidence that his alleged conduct caused plaintiff's injuries. Specifically, Sotelo argues that Avery's evidence reveals that she was suffering from severe emotional stress beginning as early as June 1987 when she came under the supervision of Charlene Webb. Sotelo argues that Avery testified that Webb was hostile towards her from the first day that she became her supervisor and that plaintiff's emotional stress was caused by her antagonistic supervisor rather than by Sotelo's comments.

While it is true that the medical legal report submitted by J. Prakash, M.D., a specialist in internal medicine, indicates that Avery's severe emotional stress was caused by her antagonistic supervisor, it also mentions Sotelo's sexual harassment as a cause of Avery's condition. Avery testified that she was able to handle Webb's antagonism because she was receiving psychological counseling which helped her cope with Webb's daily conduct. Further, the Personal Perfor-

mance Reviews submitted by Avery indicate that up until the 11 days medical leave which Avery took in June 1988, she had near perfect attendance. It is clear to this court that Sotelo's conduct commencing in May 1988 and culminating in October 1988, set off a "chain of events" that ultimately caused Avery to suffer a complete mental collapse diagnosed as major depression and post traumatic stress disorder.

■ Sotelo's argument that any damages caused by his conduct should be apportioned between other parties also lacks merit. Sotelo did not proffer any authority in support of this contention. In fact, California law is to the contrary:

> If a plaintiff suffers unusual injury by reason of defendant's act and other contributing causes, the general tendency is to hold the defendant liable for the entire injury. Thus, the plaintiff, by reason of prior injury or disease, may have been unusually susceptible, and have suffered a more serious injury than was foreseeable. (*Smith v. Schumacker* (1938) 30 C.A.2d 251, 263, 85 P.2d 967; *Deibler v. Wright* (1931) 119 C.A. 277, 284, 6 P.2d 344; *see Taylor v. Pole* (1940) 16 C.2d 668, 672, 107 P.2d 614; *Hagy v. Allied Chemical & Dye Corp.* (1953) 122 C.A.2d 361, 367, 265 P.2d 86; Rest.2d, Torts § 461; 15 Loyola L.A. L.Rev. 409 ["thin skull" plaintiff concept]; 22 Am.Jur.2d, Damages §§ 111 et seq., 122; 31 A.L.R.3d 1000; BAJI (7th ed.), Nos. 14.65, 14.66).

6 Witkin, *Summary of California Law,* Torts § 1414 (9th ed. 1988 & Supp.1994).

In summary, the defendant takes the plaintiff "as is." Thus, Avery successfully established each of the elements outlined by the BAP in *Gee.* The remaining question is the amount of Avery's non-dischargeable claim.

### DAMAGES

■ Avery requests wage loss damages of $37,430.40. She testified that at the time of her hospitalization she was earning $12.96 per hour as a lead supervisor. She was off work for six weeks from October 22, 1988 to

November 28, 1988, and sustained a loss of earnings of $3,110.40.

At the recommendation of her physician, she was unable to perform as a lead inspector and, accordingly, suffered a job demotion which resulted in a wage loss of .66 cents per hour or $1,372.80 per year. Avery claims that had she been able to hold her lead inspector position she would not have been laid off and should have been able to work until her retirement in 2009. These lost earnings through the year 2009 amount to $27,456.00. She also calculates the loss of the value of the .66 cents per hour differential towards her retirement calculated as 25% of the .66 cents for years 2009 to 2029 to be $6,864.00. These three components total wage loss damages of $37,430.40. This evidence was unrebutted. Accordingly, the court allows wage loss damages of $37,430.40.

Avery claims medical special damages of $48,386.78 consisting of the following:

| | |
|---|---|
| Santa Ana Psychiatric Hospital 10/22/88—11/28/88 | $28,772.28 |
| Dr. Elnora Schmadal, Psychologist | $15,014.50 |
| Dr. Louise G. Sherk, Psychiatrist | $ 4,600.00 |
| TOTAL: | $48,386.78 |

Sotelo did not oppose the reasonableness or the amount of these damages. Avery is awarded the sum of $48,386.78 in medical special damages.

Avery requests $250,000 for pain and suffering. Sotelo argues that Avery's injuries must be apportioned to others. Presumably, Sotelo is referring to Charlene Webb, Avery's former supervisor, and her former employer Ford Aerospace Corporation. Sotelo, however, offered no authority or evidence for the court to make this finding. Avery submitted expert testimony in the form of deposition testimony by Louise G. Sherk, M.D., a Board Certified Psychiatrist who treated Avery when she was at the Santa Ana Psychiatric Hospital in 1988 and continuing through May 7, 1990 as an outpatient. This is the most troublesome and difficult aspect of this proceeding. The emotional distress suffered by Avery was severe and substantial. She was diagnosed as suffering from major depression, single episode, agitated with panic attacks, without psychotic features and the severity of psychosocial stressers was stated to be "5 severe" and was seen to be deteriorating in spite of having been prescribed anti-depressant medication (admitted fact # 19—Pretrial Order dated October 25, 1994). The evidence was once again unrebutted. Although the evidence reveals that Avery had previously been receiving counselling because of her teenage daughter's condition and because of the harsh treatment from her former supervisor Charlene Webb, it appears that she had been coping with both of these personal problems. Her attendance record at work was near perfect until Sotelo arrived on the scene in early 1988. Further, Dr. Sherk testified that Avery was "hyper-vigilant" because of a real or imagined sexual attack which occurred some 20 years previous. This is the plaintiff which Sotelo found when he commenced his conduct of sexual harassment. In Avery's case, the consequences were disastrous. Accordingly, the court finds that damages in the amount of $250,000 for pain and suffering are warranted in this case.

Avery finally requests punitive damages "in an amount that is fair and just." Sotelo's sexual harassment commenced in May 1988. Despite having his work station removed from the vicinity of the plaintiff sometime in mid 1988, he still managed to harass plaintiff in October 1988. The court notes that Dr. Sherk testified that because of the family situation involving her son and daughter, Avery's employment with Ford Aerospace Corporation was a "safe haven" in that she could go in and do well at work and that it was very important to her.

A California appellate court summarized the effect of sexual harassment when it stated:

" 'An injury is personal when it impairs the well-being or the mental or physical health of the victim.' " (*O'Hara v. Storer Communications, Inc.* [ (1991) ], *supra*, 231 Cal.App.3d [1101] at p. 1118 [282 Cal.Rptr. 712], quoting *Miller v. Carnation Co.* (1977) 39 Colo.App. 1 [564 P.2d 127, 132] ). It is beyond dispute sexual harassment in the workplace has this effect. As one commentator familiar with the subject put it, "[Sexual] harassment exists in terribly harsh, ugly, demeaning, and even debilitating ways.... It is a form of violence

**220**

against women as well as a form of economic coercion...." (Hill, *The Nature of the Beast* (1992) 65 So.Cal.L.Rev. 1445, 1447–1448). The mere fact sexual harassment occurs in the workplace does not convert the invasion of a personal right into the invasion of an economic one. "The gravamen of any sexual harassment claim is that the alleged sexual advances were 'unwelcome.'" (*Meritor Savings Bank v. Vinson* (1986) 477 U.S. 57, 68 [106 S.Ct. 2399, 2406, 91 L.Ed.2d 49, 60–61]).

*Bihun v. AT & T Information Systems, Inc.,* 13 Cal.App.4th 976, 1005, 16 Cal.Rptr.2d 787 [Feb.1993].

The rationale for allowing punitive damages is to punish the offender and to deter others from similar conduct. *Dias v. Sky Chefs, Inc.,* 919 F.2d 1370, 1376 (9th Cir. 1990). The court finds that punitive damages of $75,000 are justified in this case.

Avery requests reasonable attorney fees pursuant to Title VII and Cal.Civ. Code § 51. This adversary proceeding is based on a federal cause of action (i.e., the determination that the debt owed is non-dischargeable). Attorney fees are not authorized under 11 U.S.C. § 523(a)(6). Accordingly, plaintiff's request for attorney fees is denied. *In re Gee,* 173 B.R. at 193–194.

### CONCLUSION

This Memorandum Decision constitutes findings of fact and conclusions of law pursuant to Federal Rules of Bankruptcy Procedure 7052. Counsel for plaintiff is directed to file with this court an order in conformance with this Memorandum Decision within ten (10) days from the date of entry hereof.