In re John E. TOPAKAS and Jacqueline Topakas, Debtors.

Rose Mary LICCIO, Plaintiff,

v.

John E. TOPAKAS, Defendant.

Bankruptcy No. 96–11545DAS.
Adversary No. 96–0624DAS.

United States Bankruptcy Court,
E.D. Pennsylvania.

Nov. 20, 1996.

Robert Szwajkos, Lavin, Coleman, Finarelli & Gray, Philadelphia, PA, for Debtors.

M. Susan Sheppard, McCabe, Weisberg, Conway & Watson, Philadelphia, PA, for Plaintiff.

Michael H. Kaliner, Trustee, Fairless Hills, PA.

Frederic Baker, Ass't United States Trustee, Philadelphia, PA.

## OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

The instant adversary proceeding ("the Proceeding") requires this court to determine whether the unliquidated claims of waitress ROSE MARY LICCIO ("the Plaintiff") of sexual harassment against her employer, restaurant co-owner JOHN E. TOPAKAS ("the Debtor"), are non-dischargeable pursuant to 11 U.S.C. § 523(a)(6). The conduct at issue is several allegedly sexually-oriented touchings combined with sexually-related utterings. The principal defenses are that the conduct never happened or has been exaggerated in a contrived boilerplate federal district court complaint.

Despite the Plaintiff's sloppy pleading, we disbelieve the Debtor's denials that the conduct and speech occurred as the Plaintiff described, because she and her witnesses were highly credible and the debtor was not credible in the least. Our disbelief of the Debtor supports the conclusion that his actions were in fact malicious as well as willful. The aspect of the Plaintiff's case which we find most difficult to accept, *i.e.*, allegations of her virtual psychological collapse as a result of the Debtor's conduct, present an issue of what should be the appropriate damages. This issue, however, will be resolved by the district court, where the Plaintiff had filed a Civil Rights action shortly before the Debtor's bankruptcy filing and which our disposition will permit to resume.

### B. FACTUAL AND PROCEDURAL HISTORY

The Debtor and his wife Jacqueline (referenced collectively as "the Debtors") filed the underlying voluntary joint Chapter 7 bankruptcy case ("the Case") on February 26, 1996. It was preceded by the Plaintiff's filing of a Civil Rights action alleging sexual discrimination and harassment in the United

States District Court for the Eastern District of Pennsylvania, at C.A. No. 96–1058 ("the C.R. Action"), on February 12, 1996. Although the C.R. Action preceded the filing of the Case by two weeks, the Debtor attempted to make an issue of his contention that the Plaintiff's claims were not the impetus for the bankruptcy filing by initially stating that he was not aware of the C.R. Action when he and his wife filed bankruptcy and that they did so to discharge indebtednesses of over $10 million arising from the Debtor's prior failed construction business. However, the Debtor was later compelled to reluctantly admit that he was served with the C.R. Action complaint prior to the bankruptcy filing; that there were no emergent proceedings arising from his other financial affairs at the time of the filing; and that the Plaintiff, in care of her attorney in the C.R. Action, was designated in the Debtor's bankruptcy schedules as an unsecured creditor, establishing that he was in fact aware of the C.R. Action when he filed the Case.

The Complaint in the Proceeding was filed on May 10, 1996, well prior to the May 31, 1996, deadline for objecting to the general discharge of the Debtors or the dischargeability of any of their debts. Trial was originally scheduled on September 26, 1996.

Prior to trial the parties questioned whether the C.R. Action should not be permitted to go to trial before the Proceeding, thereby avoiding possible multiple litigation. We did not think that this was so, even though we acknowledged our unwillingness to liquidate the Plaintiff's claim. *See In re Clayton,* 195 B.R. 342, 345–46 (Bankr.E.D.Pa.1996); *In re Shapiro,* 188 B.R. 140, 149 (Bankr.E.D.Pa. 1995) (FOX, J.); and *In re Stelweck,* 86 B.R. 833, 844–45 (Bankr.E.D.Pa.1988), *aff'd sub nom. United States v. Stelweck,* 108 B.R. 488 (E.D.Pa.1989) (task of bankruptcy court is to determine dischargeability, not liquidate a nondischargeable claim). Were the C.R. Action litigated first, the parties would nevertheless have to return to this court to determine dischargeability of the Plaintiff's claim unless the Debtor had prevailed, although collateral estoppel of certain findings in the C.R. Action in favor of the Plaintiff could

apply here. However, the Proceeding presented the Plaintiff with the more difficult task of establishing not only legitimate claims, but also that her claims were nondischargeable. Had the Plaintiff failed in either regard, the Debtor would have been entitled to the normative bankruptcy relief of discharge from the liabilities alleged in the C.R. Action and a permanent injunction against its going forward. Therefore, it seemed logical to have the Proceeding go forward first.

The trial was therefore rescheduled for October 29, 1996. After its completion on that date, we gave the parties until November 12, 1996, to file briefs in support of their respective positions in this adversary action, which they did in timely fashion.

The Plaintiff, an unmarried woman in her late 40's, was initially employed at Dynasty Inn ("Dynasty"), located at 43 Snyder Avenue, in South Philadelphia, as a waitress from 1989 to December 1993, when it was under prior ownership. After a fire at the restaurant in December 1993, it was sold to the Debtor, who appears to be in his 50's, has been married 28 years, and is the father of six children, and another individual identified at the trial only as Nick,[1] who reopened it in October 1994 and rehired several of the former waitresses, including the Plaintiff.

The Plaintiff testified that she never had any problems at Dynasty until November 1994. At that time, she described an initial incident wherein, while she was standing at a soda machine, the Debtor rubbed his groin area against her buttocks. She stated that she did not say anything to the Debtor, but rather gave him a "dirty look" and tried to ignore the incident, thinking that maybe the space in the area near the soda machine was too tight and that he did not mean to rub up against her in the manner in which he did.

However, shortly thereafter, the Plaintiff stated that, when she was standing near a coffee machine, the Debtor again rubbed his groin area against her buttocks. As before, she did not say anything to him about the incident.

---

1. The transcript phonetically recites his last name as "Coligrios."

Later in that same month the Plaintiff testified that, while she was standing at a salad bar, the Debtor asked her, in a suggestive manner, whether she was married or dating. The Plaintiff testified that she did not respond to his questions, although she believed them inappropriate, because she needed her job and did not want to get fired. However, she then told her co-workers about the previous incidents.

The Plaintiff next related an incident of December 23, 1994, when she and a friend went to Dynasty for an evening dinner after she had worked that day. While she was at the juke box talking to two co-workers, one of whom, Augusta ("Gussie") Pina, testified at trial, the Debtor suddenly walked up to her and grabbed her between the legs near her crotch. The Plaintiff, although unable to say anything to the Debtor because he walked away immediately thereafter, testified that she was so upset by this occurrence that she left immediately and shortly thereafter told Nick about this incident, assuming that he would speak to the Debtor to get him to cease his unwelcome sexually-related conduct.

The Plaintiff's testimony regarding the December 23, 1994, incident was fully supported by Pina's testimony at trial. Pina further stated that she and the Plaintiff had been discussing the Debtor's sexually-related conduct towards the Plaintiff just before this incident occurred. We reject the Debtor's contention that the juxtaposition of this discussion and the event rendered Pina's testimony incredible. Contrary to the Debtor's allegations in his brief, the record does not support the conclusion that Pina was a personal friend of the Plaintiff, but was simply a co-worker who lived in a distant area of the City. Although no longer employed at Dynasty, Pina reflected no animosity towards the Debtor or Dynasty which would have adversely affected her credibility.[2]

Pina also testified in support of the Plaintiff's claims that Dynasty was a sexually-abusive environment. She stated that it was rumored that the Debtor was involved in an affair with a barmaid named Maria. Also, she stated that she witnessed an incident in January 1995 when the Debtor opened the vest of another waitress, Donna Kruc, and commented that Kruc had "little boobs." Kruc, although still an employee at Dynasty, corroborated this incident and her resulting embarrassment in her own, understandably reluctantly-delivered testimony.

The Plaintiff next stated that, in January 1995, when she had mentioned to the Debtor that she went to a nightclub to watch the Super Bowl, the Debtor, the next day, asked her if she "got lucky with a man" that night.

The final incident occurred on February 19, 1995. Near the end of her shift on a Sunday, the Plaintiff was sitting in a booth with Kruc. She testified that, because she was experiencing "hot flashes," she unbuttoned a top button on her blouse and fanned herself with the collar. She stated that the Debtor suddenly approached her and, touching her breast, stated that she had "nice boobs." She stated that both she and Kruc were shocked and Kruc called the Debtor a "dirty old man." Kruc verified her own shock, but testified that the Debtor stated "Are you looking for a man?" and that her own comment to the Plaintiff was, "I can't believe he did that." Kruc stated that she then went to the back of the restaurant to tell Michael Platanis, the Debtor's son-in-law and the manager of Dynasty, about this incident.

The Plaintiff, upset by this incident, immediately left Dynasty that day, but testified that she still planned to return to work because she needed her job to help put her daughter through nursing school. She worked a three-hour morning shift the next day. However, that evening she decided that she could not continue to work at Dynasty because it required her to be in the Debtor's presence. She called Platanis to so advise

---

**2.** The Debtor commented that Pina's statement that "you gotta do what you gotta do" indicated a willingness to help the Plaintiff, allegedly her "close friend." In addition to lacking support of any close friendship, the record indicates that Pina used this phrase to encourage the Plaintiff to speak to Nick about the incident, in response to the Plaintiff's expressed fear that doing so would cost her her job. The comment did not relate at all to Pina's own willingness to provide testimony.

him and to arrange to retrieve her last paycheck upon advice from Platanis that she could do so. However, when she arrived at the restaurant on February 22, 1995, Platanis refused to release her check, allegedly because the Debtor was not on the premises. Thereafter, Susanne Mita, a friend of the Plaintiff who accompanied her, got into an altercation with Platanis. In a subsequent physical confrontation between Platanis and Mita, during which Mita was scratched and her clothing was torn and the Plaintiff was kicked by Platanis. She contacted the police about the incident of both February 19, 1995, and February 22, 1995. However, the police report erroneously indicates that Platanis was the "offender" in not only scratching Mita and ripping her clothes, but also in fondling the Plaintiff's breast.

The Plaintiff, who expressed what we find was genuine emotional discomfort at relating all of the foregoing, and began crying at various times, testified that, subsequent to the foregoing incidents, she began experiencing emotional and physical problems for which she initially sought medical treatment on February 27, 1995. She testified that she continues to receive psychiatric care and medication for sleeping, and appeared to be a distraught individual. Although there was no expert testimony diagnosing her condition nor its cause, nor any testimony regarding her customary emotional well-being prior to these incidents, her implicit contention that the Debtor's actions caused her infirmities appeared to be a plausible hypothesis.

As some evidence of her deterioration as a result of these incidents, the Plaintiff testified to her work history following employment at Dynasty, which the Debtor conceded had been quite satisfactory. She testified that she worked at Dunkin Donuts for two to three weeks, but quit the job because many of the customers were customers at Dynasty, who had heard stories about the incidents between her and the Debtor. She also worked at the Oregon Diner for three to four months, but left for unexplained reasons. She presently receives only public assistance and was quite convincing in stating that she generally feels "terrible."

The Plaintiff lives with her 80-year-old father, who is ill, and has been hospitalized several times in the past year. In cross-examination in which the Debtor attempted to suggest that the father's medical condition had caused her emotional difficulties, the Plaintiff admitted that she was very close to her father, and concerned and upset about his condition.

The Plaintiff attached the Complaint in the C.R. Action to the Complaint in the Proceeding and presumably meant to incorporate its averments therein by doing so. The C.R. Action complaint, in addition to misspelling the Debtor's name, includes the following averments: (1) "the Plaintiff made numerous complaints to Defendant, it [sic] agents, servant [sic] and employees;" (2) the Debtor "sexually harassed other female employees of the Defendant and did compel their submission to sexual intimacies and activities and other acts of sexual harassments;" and (3) "[t]he sexual harassment by John Topkas [sic] was rejected and was designed to compel the Plaintiff to submit to his sexual advances."

In a Count asserting a cause of action for "False Imprisonment & Unlawful Restraint," the Complaint states, inter alia, as follows:

19. On February 19, 1995, Defendant, John Topkas [sic] cornered Plaintiff in the Defendant's facility grabbed her breast and would not let her leave the facility.

20. Defendant, John Topkas [sic] refused to release Plaintiff, but continued to assault, seize, hold, and restrain the Plaintiff.

In a Count for "Assault and Battery" the following is alleged:

27. As a result of the assault and battery upon her by the Defendant, Topasak [sic] the Plaintiff sustained multiple bruises and contusions in and about the body, back and limbs, and external injuries in and about the body, back and limbs, and she did in particular, but without limitation, sustain a discoloration of the breast, contusion of the chest, contusion and abrasion of the arm, and severe emotional stress, some of which or all of which injuries are or may be permanent in nature. Plaintiff also makes a claim for such inju-

ries, damages and consequences resulting from the assault and battery of which she has no present knowledge.

28. As a further result of the assault and battery by Defendant, Plaintiff suffered and underwent great pain and was hindered and prevented from performing and transacting her usual affairs and business.

29. As a further result of the assault and battery by Defendant, Topkas [sic], Plaintiff was forced to expend various sums of money in endeavoring to cure herself of her injuries and may in the future be required to expend further sums of money in endeavoring to cure herself of the injuries.

The Complaint in the Proceeding, while implicitly incorporating all of the above and, although reciting few factual allegations of its own, restates the last incident as follows:

9. On April 17, 1995, Defendant, John Topakas cornered Plaintiff in the Defendant's facility, grabbed her breast and would not let her leave the facility.

The Plaintiff readily admitted that the foregoing allegations were grossly-exaggerated and/or totally inaccurate recitations of her claims. The Debtor easily rebutted the allegations quoted herein, stating credibly that he was a family man who had never physically injured the Plaintiff, never prevented her from leaving Dynasty at any time, never talked "dirty" to her, and did not proposition her for sex. Far less convincing were his attempts to deny or trivialize the events as described by the Plaintiff and her witnesses.

The Debtor described himself as a friendly, "touchy" guy. He denied ever brushing up against the Plaintiff's buttocks and attributed any such contacts to incidental contacts of passage by large people in tight quarters. He stated that he did not recall opening Kruc's vest and talking about her breast size. He stated that he did not recall anything about the December 23, 1994, incident. He also testified that he did not recall ever asking the Plaintiff about her private life or sex life.

With regard to the only incident which he did recall, that of February 19, 1995, the Debtor testified that he approached the Plaintiff to reprimand her for having her blouse open while his 12–year–old son was in proximity busing tables. He stated that he told her to button up her blouse and asked whether she was looking for a man. He initially denied having touched her breast at all. He then conceded that, if Kruc said he touched her breast, he probably had done so, but attempted to suggest that it was a barely noticeable accidental contact. He was confronted with attempts at his deposition to suggest that both he and Kruc had taken the incident lightly. This recitation was, however, inconsistent with Kruc's own expressions of indignation at his conduct.

In addition to stating that he never harassed the Plaintiff, at one point in the trial he got upset and stated that "the only person being harassed is me." Also, at one point, he addressed the Plaintiff's female attorney as "Honey." Finally, while presenting no testimony regarding most of the incidents described by the Plaintiff, he took care to describe that Platanis, now his son-in-law, had become a Greek Orthodox priest and was "meek and mild," presumably as a rebuttal in light of his role in the physical fracas with the Plaintiff and Mita over the Plaintiff's final paycheck.

## C. DISCUSSION

### 1. The Debtor's Conduct Directed Towards the Plaintiff Constituted Actionable Sexual Harassment of Her.

■ As noted in the authorities cited at page 853 *supra*, it is not the function of this court to liquidate any damages to which the Plaintiff might be entitled as a result of the Debtor's conduct. Rather, it is our duty to merely determine whether any claims of the Plaintiff against the Debtor should be discharged in the Case in light of the Plaintiff's contention that her claims are non-dischargeable under 11 U.S.C. § 523(a)(6).

In order to resolve that question, it is initially necessary to analyze the nature of the Plaintiff's claims and determine whether they are actionable at all. If not, it appears that no § 523(a)(6) claim could be stated. *See In re McCarthy*, 179 B.R. 876, 880

(Bankr.N.D.Ill.1995) (§ 523(a)(6) implicitly requires that the plaintiff prove that the debtor's conduct was wrongful).

Title VII of the Civil Rights Act of 1964 considers an employer's actions to be unlawful if that employer

> fail[s] or refuse[s] to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex....

42 U.S.C. § 2000e–2(a)(1).

■ The Supreme Court has established that the conduct described in Title VII is not limited only to tangible or economic discrimination. *See Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993); and *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 64, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986). Rather, the phrase "terms, conditions, or privileges of employment" contained in the statute reveals a congressional intent to expunge all types of disparate treatment of women and men in employment, including requiring a person to work in work environments that are discriminatorily abusive or hostile to a person because of his or her sex. *Harris, supra,* 510 U.S. at 21, 114 S.Ct. at 370; and *Vinson, supra,* 477 U.S. at 64, 106 S.Ct. at 2404, both quoting *Los Angeles Dep't of Water & Power v. Manhart,* 435 U.S. 702, 707, n. 13, 98 S.Ct. 1370, 1374–75, n. 13, 55 L.Ed.2d 657 (1978), in turn quoting *Sprogis v. United Air Lines, Inc.,* 444 F.2d 1194, 1198 (7th Cir.), *cert. denied,* 404 U.S. 991, 92 S.Ct. 536, 30 L.Ed.2d 543 (1971). A plaintiff can establish that a violation of Title VII has occurred by showing that discrimination or harassment based on gender occurred which was so severe or pervasive that it had the effect of altering the conditions of employment and creating an offensive or hostile work environment. *Harris, supra,* 510 U.S. at 21, 114 S.Ct. at 370; *Vinson, supra,* 477 U.S. at 66, 106 S.Ct. at 2405; *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1482 (3d Cir.1990); and *In re Reproduction Systems, Inc.,* 133 B.R. 493, 499 (Bankr.W.D.Mo.1991).

■ Similarly, the EEOC guidelines provide that

> [h]arassment on the basis of sex is a violation of Section 703 of Title IV. Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature, constitutes sexual harassment when ... (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

29 C.F.R. § 1604.11(a). The trier of fact must determine whether sexual harassment has occurred based on the totality of circumstances and on the record as a whole. *Vinson, supra,* 477 U.S. at 69, 106 S.Ct. at 2406–07, citing 29 C.F.R. § 1604.11(b).

■ The Supreme Court has further explained that, in order for conduct to be considered as sexual harassment, the conduct does not have to "seriously affect employees' psychological well-being," nor cause the employee to suffer any injury. *Harris, supra,* 510 U.S. at 22, 114 S.Ct. at 370–71. The determination of whether conduct is abusive must be determined by considering the totality of the circumstances. *Id.* at 23, 114 S.Ct. at 371. Factors for the court to consider in making its determination include the frequency of the discriminatory conduct, the severity of the conduct, whether the conduct was humiliating or physically threatening or just a mere offensive utterance, whether the conduct unreasonably interfered with the employee's work performance, and whether other employees were sexually harassed. *Id.* See also *Andrews, supra,* 895 F.2d at 1482; and *Stair v. Lehigh Valley Carpenters Local Union No. 600, United Brotherhood of Carpenters & Joiners of America,* 813 F.Supp. 1116, 1119 (E.D.Pa.1993).

■ In the foregoing analysis, the employee's psychological well-being must also be considered. *Id.* In *Andrews, supra,* 895 F.2d at 1482, quoting *Vance v. Southern Bell Telephone and Telegraph Co.,* 863 F.2d 1503, 1510 (11th Cir.1989), the court held that, in order to determine whether a particular plaintiff has established a claim of sexual harassment, a trial court must consider the totality of the circumstances, including

whether the workplace was hostile or abusive in such a manner that it was "severe enough to affect the psychological stability of a[n] ... employee." Other courts have held that, in order for conduct to rise to the level of harassment, "the conduct must be 'unwelcome' in the sense that the employee did not solicit or invite it, and the employee regarded the conduct as undesirable or offensive." *Reproduction Systems, supra,* 133 B.R. at 500, quoting *Hall v. Gus Construction Co.,* 842 F.2d 1010, 1014 (8th Cir.1988).

In a § 523(a)(6) case like that at hand, *In re Sotelo,* 179 B.R. 214 (Bankr.S.D.Cal.1995), the debtor's subordinate sued him for general and punitive damages which resulted from his alleged sexual harassment of her. In that case, the female plaintiff testified regarding numerous incidents when the debtor made unwelcome comments regarding her physical attractiveness. *Id.* at 215. The plaintiff began experiencing a variety of physical symptoms including panic attacks, which she alleged were due to the debtor's harassment of her. *Id.* at 216. She complained about the debtor's conduct to their supervisor, who refused to reprimand the debtor. *Id.* Thereafter, the plaintiff saw an attorney who agreed to take her case. *Id.* The attorney in turn notified the debtor that he would be filing a suit against him for sexual harassment on the employee's behalf. *Id.* The next day an unidentified female called the plaintiff on the telephone and stated "back off—or you're dead!" *Id.* Following the call, the plaintiff suffered a complete mental collapse and was hospitalized for over 30 days at a psychiatric hospital. *Id.*

The *Sotelo* court held that the debtor's conduct was wrongful and in violation of Title VII. *Id.* at 218. The court also determined that, although the debtor's harassment of the plaintiff was not the sole cause of her emotional distress,[3] it was clear to the court that his actions "set off a 'chain of events' that ultimately caused [the plaintiff] to suffer a complete mental collapse." *Id.* at 218.

■ Applying the factors delineated in *Harris,* and considering the analysis in *Sotelo,* it is clear that, as to the frequency prong, the Debtor's conduct, while not occurring every day, was occurring on a consistent basis. In addition, not only did the Debtor make verbally offensive comments to the Plaintiff, but he also touched her inappropriately on her crotch, buttocks, and breast, which satisfies both the severity prong and the requirement that the actions in issue be more than a mere offensive utterance, as required by the *Harris* test and as was the case in *Sotelo.* With regard to the requirement that the conduct be humiliating or physically threatening, the Plaintiff clearly exhibited humiliation from the Debtor's actions. In light of the fact that the Plaintiff has not been able to hold down a job since the events in question despite her previously being a fine waitress, the Plaintiff has sufficiently alleged that the Debtor's conduct unreasonably interfered with her work performance. *Compare Sotelo.* Finally, at least one other employee of Dynasty was, to at least some degree, subjected to sexual harassment, *i.e.,* Donna Kruc. Accordingly, the Plaintiff has established that the Debtor's conduct toward her was abusive pursuant to the Supreme Court's *Harris* test.

■ The responses of the Debtor are, principally, that the Plaintiff was unable to prove the allegations of her "boilerplate" complaint; that the incidents recited were imagined or grossly exaggerated; and that, even if the Plaintiff's allegations were true, her reactions were not supported by clinical findings and were disproportionate to the allegedly-mild nature of his conduct. It is true that the Plaintiff's counsel, while forcefully advocating her client's claims, was extremely derelict in failing to plead the facts as they really happened. However, the Plaintiff, while not blameless for allowing false allegations to be made on her behalf, was also quite believable in disassociating herself from the misplaced exaggerated allegations in the Complaints without hesitation.

---

**3.** The telephone call containing the threat was obviously not made by the Debtor, although it was perhaps reasonable to assume that he instigated it. However, in addition, the plaintiff was having difficulties with a female supervisor at

work. *Id.* at 218. Furthermore, she was also having problems with a teenaged daughter and was diagnosed as " 'hyper-vigilant' because of a real or imagined sexual attack which occurred some 20 years previous." *Id.* at 219.

The testimony of Pina and especially Kruc, whose courage is to be admired since she remains a Dynasty employee, were supportive of the Plaintiff's position that the incidents were deemed seriously inappropriate by all other observers. The Debtor had no supporting witnesses despite his ready access to Dynasty employees who would appear to have been economically motivated to support him if they could. The Debtor's denial that all of the incidents except that of February 19, 1995, occurred, and his attempts at revisionist scenarios of that incident (initially denying any touch, then claiming it was all in fun, and finally ironically attempting to paint himself as the guardian of his son's morals in these actions) were totally lacking in credibility.

■ To some degree, we can understand the Debtor's contentions that, when weighed against similar events sometimes described in the media, his conduct, even if it occurred exactly as the Plaintiff described it, should not have caused the claimed distress to a mature woman of the world such as the Plaintiff. This contention was supported by the inaccuracies and exaggerations in both the C.R. Action Complaint and the Complaint in the Proceeding incorporating it, suggesting that the true facts had to be distorted to make out a case.

However, we do not agree that this contention should exonerate the Debtor. The damages will be liquidated in the trial of the C.R. Action. The district court may well conclude, in litigation of that Action, that lack of proximate cause will eliminate most if not all of the alleged damages.

Furthermore, in *Sotelo, supra*, the debtor vigorously argued, similar to the Debtor's contentions, that he should not be held liable to the employee for all of her damages, since other persons' conduct also contributed to her mental collapse. *See* page 858 & n. 3 *supra*. In response, the court observed that a defendant takes a plaintiff "as is." 179 B.R. at 218. Thus, the court opined that, if a plaintiff is "unusually susceptible" to injury based on a prior existing condition, the defendant may still be liable for the entire injury. *Id.*

■ The *Sotelo* court thus applied the blackletter "thin skull" or "egg shell" plaintiff rule. This rule basically provides that, as a tortfeasor, one takes a victim as the victim is found. *See Botek v. Mine Safety Appliance Corp.*, 531 Pa. 160, 166, 611 A.2d 1174, 1177 (1992); *Fretts v. Pavetti*, 282 Pa.Super. 166, 175, 422 A.2d 881, 885 (1980); *Lebesco v. Southeastern Pennsylvania Transportation Authority*, 251 Pa.Super. 415, 423, 380 A.2d 848, 851 n. 2 (1977); and *Tomikel v. Commonwealth Dep't of Transp.*, —— Cmwth. ——, ——, 658 A.2d 861, 863 (1995). Therefore, a tortfeasor is liable for a victim's injuries even if the victim is particularly sensitive to injury and this sensitivity resulted in more harm to the victim than was foreseeable to the tortfeasor. *Lebesco, supra*, 251 Pa.Super. at 423 n. 2, 380 A.2d at 852 n. 2.

Considering the totality of the instant factual circumstances, we conclude that the Plaintiff has met her burden of proving that she raises legitimate claims that she was sexually harassed by the Debtor. Having made that determination, we must turn to our inquiry to whether this conduct was in violation of 11 U.S.C. § 523(a)(6).

2. *The Plaintiff's Claims Against the Debtor Are Not Dischargeable Under Section 523(a)(6) of the Code Because the Debtor's Actions Were Both Willful and Malicious.*

The Bankruptcy Code provides, at 11 U.S.C. § 523(a)(6), that

(a) A discharge under section 727, ... of this title does not discharge an individual debtor from any debt;

. . . . .

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity; ...

The nature of this Code section was comprehensively analyzed in *In re Conte*, 33 F.3d 303, 305–09 (3d Cir.1994). Section 523(a)(6) has been applied by this court in, *e.g., In re Blanchard*, 201 B.R. 108, 117–19 (Bankr. E.D.Pa.1996) (debtors' sale of equipment and furniture of a learning center without recognition of seller-creditor's security interest therein was excused because the debtors

were unaware of the security interest and they were acting for their creditors' general benefit); *In re O'Donnell, James v. O'Donnell,* Bankr. No. 95–16019DAS, Adv. No. 95–0833 (Bankr.E.D.Pa. March 8, 1996) (debtor's actions in attacking the plaintiff's decedent in retaliation for reports of drug activities at his place of business found nondischargeable); *In re Grubb, DeMarco v. Grubb,* Bankr. No. 95–12946 DAS, Adv. No. 95–0656 (Bankr. E.D.Pa. Dec. 14, 1995), *aff'd,* 1996 WL 230019 (E.D.Pa. May 3, 1996), *appeal docketed,* 96–1475 (3d Cir.) (judgment for plaintiff arising from the debtor's request to the plaintiff to cash an allegedly-forged check found not non-dischargeable despite an award of punitive damages to the plaintiff in a prior undefended state-court action because no certainty of the debtor's action in producing injury to the plaintiff was proven); *In re Nickels,* 1991 WL 202256 (Bankr.E.D.Pa. Oct. 2, 1991) (allowing release of contaminants on landlord's property by a business in which the debtor's husband was a principal was found dischargeable because no intention to harm the landlord was proven); *In re Gaebler,* 83 B.R. 264 (Bankr.E.D.Pa. (*"Gaebler I"*), *rev'd,* 88 B.R. 62 (E.D.Pa.1988) (*"Gaebler II"*) (debtor's shooting of ex-wife's lover excused because of debtor's mental illness; reversed on appeal); and *In re Lane,* 76 B.R. 1016, 1023 (Bankr.E.D.Pa.1987) (debtor's refusal to return property allegedly given to her by an ex-lover found at best to be a simple conversion and therefore dischargeable despite § 523(a)(6)).

The Plaintiff asserts that her claims against the Debtor are nondischargeable under § 523(a)(6) because the Debtor acted both willfully and maliciously in sexually harassing her over almost the entire period of four months during which she was employed by him at Dynasty and which, given her lack of affirmative responses and the reactions of her co-workers, he knew was not favorably received and was inappropriate.

In *Lane,* we adopted a very narrow view regarding the applicability of § 523(a)(6), stating that it "requires an act with intent to cause injury to the victim." 76 B.R. at 1023. *Accord Gaebler I,* 83 B.R. at 267. *But see Gaebler II,* 88 B.R. at 65 ("a creditor need

only prove that a debtor intentionally committed an act, without just cause or excuse, which necessarily produces injury").

In this regard, the *Conte* court, 33 F.3d at 308, adopted a test very much like that enunciated in *Gaebler II* ("willful and malicious injury … include[s] wrongful actions taken with substantial certainty of producing injury"). Thus, while more than mere reckless disregard of a debtor's duties is needed to successfully invoke § 523(a)(6), there is no requirement of a showing of specific malice. *Id.* Consequently, a debtor's actions will be considered to be willful and malicious under § 523(a)(6) if the actions are deliberate and taken with the specific intention of producing injury or if they have a substantial certainty of producing injury. *Id.* at 305, 307, 308, 309.

As the Debtor's counsel correctly points out in his post-trial brief, the *Conte* court, *id.* at 308, quoted from the RESTATEMENT (SECOND) OF TORTS, § 8A, comment b, at 15 (1965), regarding the definition of intent, which states that

[i]ntent is not … limited to consequences which are desired. If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes forward, he is treated by the law as if he had in fact desired to produce the result. As the probability that the consequences will follow will decrease, and becomes less than substantial certainty, the actor's conduct loses the character of intent and becomes mere recklessness.

However, we fail to see where that analysis aids the Debtor here.

In order to prevail on claims under § 523(a)(6), as under any claims under 11 U.S.C. §§ 523(a) and 727(a), a creditor must prove every element of the claims by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 282–89, 111 S.Ct. 654, 656–61, 112 L.Ed.2d 755 (1991); *In re Braen,* 900 F.2d 621, 626 (3d Cir.1990), *cert. denied,* 498 U.S. 1066, 111 S.Ct. 782, 112 L.Ed.2d 845 (1991); and *Blanchard, supra,* 201 B.R. at 114. Thus, it is the Plaintiff's burden to prove, by a preponderance of the evidence, that the Debtor acted deliberately and with

at least a substantial certainty of producing injury to her.

 Several courts have already decided that sexual harassment claims may fall within the § 523(a)(6) exception to dischargeability. *See In re Gee,* 173 B.R. 189 (9th Cir. BAP1994); *Sotelo, supra;* and *In re Miera,* 104 B.R. 150 (Bankr.D.Minn.1989), *aff'd,* 926 F.2d 741 (8th Cir.1991). *Cf. In re McGuffey,* 145 B.R. 582 (Bankr.N.D.Ill.1992); and *In re Moore,* 1 B.R. 52 (Bankr.C.D.Cal.1979) (both holding that Civil Rights claims arising from racial discrimination in housing are nondischargeable under § 523(a)(6)). In this case, the Plaintiff has proven the requisite level of intent to sustain her claims. The testimony elicited at trial from the witnesses and both parties make it clear that the Debtor's actions toward the Plaintiff were committed willfully and maliciously in violation of the Plaintiff's civil rights under Title VII.

The Debtor's conduct was unquestionably willful. There is no claim, even by the Debtor, that the Plaintiff in any way brought on the Debtor's conduct by even so much as sexually provocative dress or conduct or by any verbal encouragement. In fact, she credibly testified that she tried her best to keep her distance from the Debtor.

The element of malice is usually the more difficult of the two prongs of § 523(a)(6) to prove. The Debtor's responses, in addition to his denials that the incidents actually occurred, which we thoroughly disbelieve, are the normal ones of parties faced with such charges, *i.e.,* that no harm (but rather a compliment to the target's sexual attractiveness) was intended; that the acts were committed in sense of good (if not so clean) fun; and that certainly no injury to the extent which resulted was foreseen. These, and like defenses, were summarily rejected in *Gee, supra,* 173 B.R. at 192–93; *Sotelo, supra,* 179 B.R. at 217–18; and *Miera, supra,* 104 B.R. at 159. Nevertheless, some comment on the particular actions in issue here is appropriate.

It is difficult to see how a man's acts of grabbing a woman's crotch and touching her breast, in public, without very strong signals from the woman that such conduct was appreciated, would ever be deemed appropriate, mutually enjoyable, "fun," and unlikely to produce any injury, at least embarrassment and humiliation, to the woman.

The Debtor has not invoked the defense of mental illness, like the *Gaebler* debtor. He cannot make a claim of right to the actions taken, as did the *Lane* debtor. Therefore, his conduct appears to have been proven sufficient to clear even the difficult barrier to successful § 523(a)(6) actions articulated in those cases, let alone the more relaxed *Conte* standards. The Debtor cannot credibly claim ignorance of violations of the claimants' rights, as in *Blanchard,* nor ignorance of the repercussions of his actions, like the *Nickels* debtor. The potential for injury to the Plaintiff, at least to some degree, from the Debtor's conduct was much more readily foreseeable than the conduct at issue in the *Grubb* case.

 Finally, the Debtor's front-line defense was not that the Plaintiff over-reacted to his conduct. Rather, it was a close-minded and unconvincing denial that what was described ever happened. Finding no claim of a mental incapacity causing such denials, it is most disturbing to us to be confronted with a Debtor who we find was simply dishonest in his testimony to this court. The bankruptcy discharge is the entitlement of the "honest" debtor, or at least the debtor who finally "comes clean" in bankruptcy court. As we stated in *In re Glen,* 115 B.R. 837, 842 (Bankr.E.D.Pa.1990), quoting *In re Butler,* 86 B.R. 829, 831 (Bankr.E.D.Pa.1988):

> "It is our experience that disposition of dischargeability complaints turns largely on the credibility of the parties. *Compare Gaebler, supra,* 83 B.R. at 269 (debtor credible; debt discharges) with *In re Mistry,* 77 B.R. 507, 510, 512–13 (Bankr. E.D.Pa.1987), *aff'd sub nom. Writer v. Mistry,* C.A. No. 87–6466 (E.D.Pa. Feb. 9, 1988); and *In re Somerville,* 73 B.R. 826, 833, 837, 838 (Bankr.E.D.Pa.1987) (debtors not credible; debts not discharged))...."

*See also In re Sullivan,* 198 B.R. 417, 423 (Bankr.D.Mass.1996) ("a finding of 'willful and malicious' conduct necessitates an inquiry by the court, *not* into the debtor's motivation, but into the degree of immorality of the

debtor's conduct.... It was proven at the trial that.... [t]he conduct also contained aggravating features making it malicious. The trespass and injurious activities continued for several months after it was brought to the attention of the Debtor's workcrew a trespass existed. I therefore conclude the conduct was willful and malicious within the meaning of section 523(a)(6), and hence nondischargeable.") (footnote omitted).

We believe that the Debtor has been dishonest in his testimony to this court. Also, his conduct towards the Plaintiff was "immoral" in the colloquial sense that it displayed sexual oppression of a seemingly powerless subordinate employee at the hands of a powerful co-employer, and it was intentional and deliberate and continued throughout the four months of the Plaintiff's employment at Dynasty. Moreover, the Debtor increased his liberties taken with the Plaintiff's body despite her increasingly clear expressions of dissatisfaction with such conduct.

Thus, we conclude that the facts of this case do rise to the level necessary to prevent the dischargeability of the claims under § 523(a)(6). Both the direct evidence presented and the circumstantial evidence in this case sufficiently prove that the Debtor acted with an intent to injure the Plaintiff. Consequently, the Plaintiff has satisfied her burden of proving that the Debtor acted willfully and maliciously.

## D. CONCLUSION

An order declaring that the Plaintiff's claims asserted in the Proceeding are not dischargeable will be entered.

### ORDER

AND NOW, this 20th day of November, 1996, after the trial of the above proceeding on October 29, 1996, and upon consideration of the parties' post-trial submissions, it is hereby ORDERED AND DECREED as follows:

1. Judgment is entered in favor of the Plaintiff, ROSE MARY LICCIO ("the Plaintiff"), and against the Defendant–Debtor, JOHN E. TOPAKAS ("the Debtor").

2. It is DECLARED that the Plaintiff's claims asserted against the Debtor in her Complaint filed in the United States District Court for the Eastern District of Pennsylvania at C.A. No. 96–1058 are not dischargeable under 11 U.S.C. § 523(a)(6).